[Civ. No. 24731. Fourth Dist., Div. One. Aug. 27, 1982.]

A & M PRODUCE CO., Plaintiff, Cross-defendant and Respondent, v. FMC CORPORATION, Defendant, Cross-complainant and Appellant.

## COUNSEL

Paul, Hastings, Janofsky & Walker, Douglas C. Conroy, Claudia A. Carver, Byrd, Sturdevant, Pinney, Caldwell & Krutzsch and Andrew S. Krutzsch for Defendant, Cross-complainant and Appellant.

Thomas M. Heim and Roger T. Benitez for Plaintiff, Cross-defendant and Respondent.

## OPINION

**WIENER, J.**—Defendant FMC Corporation (FMC) appeals from the judgment entered in favor of plaintiff A & M Produce Co. (A & M) in

the net sum of $255,000 plus $45,000 attorney's fees.[1] Although this case has a rather humble origin arising from the simple business transaction in 1974 when FMC sold A & M an agricultural weight-sizing machine for $32,000, the issues now require our traversing the labyrinthine complexities of the Uniform Commercial Code, only partially illuminated by California precedent. Because of the nature of this case, we believe it helpful to state the facts before describing the issues and the manner in which they are resolved.

## I

A & M, a farming company in the Imperial Valley, is solely owned by C. Alex Abatti who has been farming all of his life. In late 1973, after talking with two of his employees, Mario Vanoni and Bill Billingsley, he decided to grow tomatoes. Although they had grown produce before, they had never grown tomatoes or any other crop requiring a weight-sizer and were not familiar with weight-sizing equipment. At the suggestion of Billingsley, they first spoke with a salesman from Decco Equipment Company regarding the purchase of the necessary equipment. The salesman explained A & M would need a hydrocooler in addition to a weight-sizer and submitted a bid of $60,000 to $68,000 for the equipment. Abatti thought the Decco bid was high, and Billingsley suggested Abatti contact FMC for a competitive bid.

In January 1974, A & M called FMC whose representative, John Walker, met with them at A & M's office. Walker admitted he was not an expert on the capacity or specifics of weight-sizing equipment. Later he brought Edgar Isch of FMC into the negotiations to assist in making the determination on the proper type of equipment. Isch did not say a hydrocooler was required. According to Abatti, Isch recommended FMC equipment because it operated so fast that a hydrocooler was unnecessary thereby saving A & M about $25,000.

The parties discussed the capacity of the sizing equipment recommended by Isch. Walker and Isch proposed a preliminary bid of

---

[1] For convenience, we have set out only the net amount of the judgment rounding off the figures here as elsewhere in the opinion. The judgment itself provides: "Plaintiff shall have judgment on its complaint against defendant in the sum of $269,235.30 with interest at the rate of 7% from September 18, 1976; [¶] Plaintiff shall recover as reasonable attorney's fees from defendant the sum of $45,000; [¶] defendant shall recover on his cross-complaint as on offset against plaintiff's judgment the sum of $14,320 with interest at the rate of 7% from June 24, 1974."

$15,299.55 for the weight-sizer. They obtained Abatti's signature to a "field order" for the equipment to "secure Abatti's consent" to order the equipment. The field order did not state the final price nor list all the necessary material and equipment. The order was on a standard form, printed on both sides, the terms of which were identical to the written contract which Abatti later received. Along with the order, Abatti delivered his $5,000 check as a deposit. Walker and Isch left a copy of the capacity chart for FMC weight-sizers which had been referred to in the negotiations.

The field order was sent to FMC where the proposed layout of the packing shed was analyzed by the engineering department, and a final list of essential materials was compiled. Abatti then received a copy of the form contract in the mail. It contained a list of all the equipment and materials being purchased, either typed in blanks on the front of the contract, or handwritten on an attached order sheet. The total bill was for $32,041.80. An exact copy of the contract appears as an appendix to this opinion. (See *post.*)

For our purposes the provisions of the agreement which are important are: paragraph 3, "Seller's Remedies" outlining the buyer's obligation to pay seller's reasonable attorney's fees in connection with any defaults by the buyer; paragraph 4, "Warranty" containing a disclaimer of warranties, in bold print; and paragraph 5, "Disclaimer of Consequential Damages" stating in somewhat smaller print that "Seller in no event shall be liable for consequential damages arising out of or in connection with this agreement...."

Abatti signed the agreement and returned it to FMC with his check for an additional $5,680.60 as a down payment. He never paid the $21,361.20 due "on delivery of equipment." In April 1974 FMC delivered and installed the machinery. A 20-foot extension to A & M's packing house was required to house the equipment. A & M's problems with the FMC equipment began during the third week of May, when it started to pick the tomatoes. Tomatoes piled up in front of the singulator belt which separated the tomatoes for weight-sizing. Overflow tomatoes had to be sent through the machinery again, causing damage to the crop. The damage was aggravated because the tomatoes were not cooled by a hyrdocooler, allowing a fungus to spread more quickly within the damaged fruit. Walker was called out and managed to control the overflow by starting and stopping the machine. This effort was counterproductive, however, because it significantly reduced the pro-

cessing speed. Unlike the Decco machinery, the FMC equipment did not have a speed control.

Abatti unsuccessfully attempted to get additional equipment from FMC and/or Decco. There was insufficient time to set up a new packing shed to hand-pick the tomatoes. Moreover, a search for other packing operators to handle A & M's tomatoes was unavailing. On June 17, A & M closed its shed because the return on the fruit—some of which had been damaged—was inadequate to cover costs. Some tomatoes were sold to a canning plant; most were rejected because they were not cannery tomatoes.

Shortly thereafter, A & M offered to return the weight-sizer to FMC provided FMC would refund A & M's down payment and pay the freight charges. FMC rejected this offer and demanded full payment of the balance due.

A & M then filed this action for damages against FMC for breach of express warranties, breach of implied warranty for a particular use and misrepresentation. A & M dismissed the misrepresentation cause of action at trial. By stipulation the trial was bifurcated to permit the judge to decide FMC's cross-complaint for the balance due on the purchase price and the issue of attorney's fees after the jury returned its verdict on the complaint.

This appeal is the result of a third trial. In the earlier two cases special verdict forms were used. The first case resulted in a hung jury; a new trial was ordered in the second.[2]

After hearing evidence presented to the jury, and additional evidence in the absence of the jury on the nature of the contract's formation and the bargaining position of the respective parties, the court ruled: "[I]t would be unconscionable to enforce [the waivers of warranties and waiver of consequential damage] provisions of the agreement, and further that they are not set out in a conspicuous fashion.

"The Court's ruling is based on all of the circumstances in this case in connection with how the negotiations were conducted, the fact that

[2]This court has also seen this case before. The order granting a new trial was affirmed in *A & M Produce Co.* v. *FMC Corporation* (Aug. 31, 1979) 4 Civ. 18292 [unpub. opn.].

initially a down payment of—a substantial down payment of $5,000 was made and later on the contract was signed." Accordingly, the jury viewed only the front of the contract, not the reverse side with its lengthy provisions.

The jury returned a general verdict for $281,326 which the parties agreed to reduce by $12,090.70, the amount already paid to FMC for the machinery. The court found for FMC on its cross-complaint, but awarded plaintiff $45,000 in attorney's fees and prejudgment interest from September 18, 1976.

## II

The history of this litigation reveals a grueling and time consuming path. The inability of the jury in two earlier trials to successfully resolve the issues in dispute is not totally surprising. The evidentiary record is long and complex; the intricacies of commercial agricultural technology are not easy to comprehend. To compound the difficulties, the court was required to make several preliminary fact determinations as the predicate for ruling on legal motions. To a significant extent, these preliminary factual questions overlap the critical factual issues before the jury and correspondingly increase the importance of the trial judge's role. We wish to stress the factual nature of the issues substantially limits our appellate role. Where the resolution of several key legal issues turns largely on inferences drawn from the facts presented, we are hesitant to interfere with the sound judgment of the trial court.

The major issues in this case involve the validity of FMC's purported disclaimer of warranties and limitation on the buyer's ability to recover consequential damages resulting from a breach of warranty.[3] Resolution

---

[3]There exists some considerable confusion between the concept of disclaiming warranties and the concept of limiting or excluding remedies for breach of warranty. (See discussion in White and Summers, Uniform Commercial Code (2d ed. 1980) § 12-11, pp. 471-472.) The former subject deals with the seller's attempt to limit the situations for which he can be held liable for breach. The latter subject assumes a breach has been established but attempts to limit the remedies available to the complaining party. In the instant contract, for example, we find much language located in the "Warranty" section which actually amounts to limitations on remedies available to the buyer. When the terms are properly sorted out, the only warranty appearing in the written document is that the material and workmanship of new equipment will be free from defects for various specified periods of time. Other language in the section purports to limit the remedy for breach of this single warranty to repair or replacement of defective parts, provided the buyer pays for shipping the equipment to the seller and back at the seller's request. (See appen., *post.*)

of both these issues turns largely on the proper application of the doctrine of unconscionability, which the trial court utilized in precluding enforcement of the warranty disclaimer and the consequential damage limitation. Although FMC concedes that California Uniform Commercial Code section 2719[4] allows a court under proper circumstances to declare a consequential damage limitation unconscionable, it argues that unconscionability is inapplicable to disclaimers of warranty, being supplanted by the more specific policing provisions of section 2316. We conclude otherwise, however, and turn our attention to the nature of this often-amorphous legal doctrine, outlining the analytic framework to be used in determining whether a particular contractual provision is unconscionable. That framework is then utilized in finding that the facts of this case, involving a preprinted form sales contract, support the trial court's conclusion that both the disclaimer of warranties and the limitation on consequential damages were unconscionable. We also reject FMC's argument that the consequential damages alleged by A & M were too speculative to be the basis for any damage award.

We then proceed to examine FMC's final contentions relating to the trial court's decision to award attorney's fees and prejudgment interest to A & M, concluding that the claimed breach of warranty is an "action on a contract" within the meaning of California's reciprocal attorney's fees statute, Civil Code section 1717, and that the trial court properly exercised its discretion under Civil Code section 3287, subdivision (b) in awarding prejudgment interest. Accordingly the judgment must be affirmed.

### III

FMC's initial attack on the judgment alleges prejudicial error by the trial court in not allowing the jury to see the reverse side of the written agreement which contained both a disclaimer of all warranties as well as a provision stating that in the event a warranty was made, the buyer was precluded from recovering consequential damages resulting from a breach of the warranty. ██ ██ ██ The trial court's decision to exclude evidence of the contents of the agreement's reverse side was based on its determination that the warranty disclaimer and the consequential damage exclusions were unconscionable and therefore unenforceable.[5] ██ ██ ██ If this determination was correct—that is, if the

---

[4]All statutory references are to the California Uniform Commercial Code unless otherwise indicated.

[5]The court's ruling was also based on the inconspicuousness of the disclaimer and exclusion provisions. (See *ante*, p. 482.) As to the disclaimer of warranty, we agree with

trial court properly applied the unconscionability doctrine to the facts of this case—then the reverse side of the contract was appropriately withheld from the jury.[6]

## A

■ Acknowledging that a limitation on consequential damages may be unconscionable (§ 2719, subd. (3)),[7] FMC asserts the trial court erred in applying that doctrine to the disclaimer of warranties. It contends unconscionability is irrelevant to warranty disclaimer provisions, having been eliminated by the specific statutory requirements of section 2316.[8] (See White and Summers, *supra*, at pp. 475-481; Leff, *Unconscionability and the Code—The Emperor's New Clause* (1967) 115

FMC that a disclaimer printed in boldface type twice as large as the other terms of the agreement is conspicuous. Section 1201, subdivision (10), specifically provides: "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. *Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color."* (*Italics added.*) This definition by its terms precludes the trial court's ruling on this issue. (*See FMC Finance Corp.* v. *Murphree* (5th Cir. 1980) 632 F.2d 413, 419.)

In contrast to the provisions of section 2316, subdivision (2), which require that a warranty disclaimer be conspicuous, the code imposes no similar requirement as to consequential damage limitations. This is not to say the conspicuousness of such a term is irrelevant; rather, it is one of several factors bearing on the procedural unconscionability of the limitation. (See *post*, pp. 485-486.) It will therefore be considered in that context rather than as an independent basis for denying enforcement to the consequential damage exclusion.

[6]FMC has also argued that even if the disclaimer of warranty was unconscionable, evidence of the disclaimer clause's presence in the contract was admissible to suggest that no warranty was ever created by action of the parties. But assuming the unconscionability of the disclaimer, its value toward proving the factual proposition that no warranty was created is slight, and substantially outweighed by the disclaimer's tendency to unfairly prejudice and mislead the jury. (Evid. Code, § 352.)

[7]Subdivision (3) of section 2719 provides: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. Limitation of consequential damages where the loss is commercial is valid unless it is proved ·that the limitation is unconscionable."

[8]Section 2316 provides in relevant part: "(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence (Section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable.

"(2) Subject to subdivision (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, ... Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'"

U.Pa.L.Rev. 485, 516-528.) Alternatively, FMC suggests the California Legislature's failure to adopt the general Uniform Commercial Code section on unconscionability (§ 2-302) as part of California's Uniform Commercial Code precludes the trial court's reliance on the doctrine in this instance.[9]

While FMC's argument is not without force, we conclude that an unconscionable disclaimer of warranty may be denied enforcement despite technical compliance with the requirements of section 2316. (See *FMC Finance Corp.* v. *Murphree, supra*, 632 F.2d at p. 420.) Unconscionability is a flexible doctrine designed to allow courts to directly consider numerous factors which may adulterate the contractual process. Uniform Commercial Code section 2-302 specifies that "any clause of the contract" may be unconscionable. The policing provisions of section 2316 are limited to problems involving the visibility of disclaimers and conflicts with express warranties. But oppression and unfair surprise, the principal targets of the unconscionability doctrine (see *post*, pp. 485-486), may result from other types of questionable commercial practices. Moreover, the subtle distinction between an "implied" warranty and an "express" warranty may do precious little to mitigate the exploitation of a party with inferior bargaining power. Yet as long as the warranty remains "implied," section 2316's policing provisions are ineffective.

FMC's contention regarding the status of the unconscionability doctrine in California is similarly unpersuasive. Unconscionability has long been recognized as a common law doctrine which has been consistently applied by California courts in the absence of specific statutory authorization. (See *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165]; *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 879 [27 Cal.Rptr. 172, 377 P.2d 284].) And although the Legislature did not adopt section 2-302 as part of California's version of the Uniform Commercial Code (see Cal.Code com., 23A West's Ann. Cal. U. Com. Code (1964 ed.) § 2302, pp. 195-

---

[9]Section 2-302 provides: "(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

198), the identical language, complete with accompanying commentary, was recently enacted as section 1670.5 of the Civil Code. (See *Graham, supra,* 28 Cal.3d at p. 820, fn. 19.) The only significant difference is that section 1670.5, placed under the "Unlawful Contracts" heading of division 3, part 2, title 4 of the Civil Code, applies to all contracts rather than being limited to those sales transactions governed by the Commercial Code. We think the trial court properly entertained A & M's arguments directed at the unconscionability of both the consequential damage exclusion and the warranty disclaimer.[10]

### B

We now turn to the principal question involved in this appeal: Whether the trial court erred in concluding that FMC's attempted disclaimer of warranties and exclusion of consequential damages was unconscionable and therefore unenforceable. Before we can answer that question however, we must first concern ourselves with the nature of the unconscionability doctrine.

The Uniform Commercial Code does not attempt to precisely define what is or is not "unconscionable." (See *Kugler* v. *Romain*

---

[10]Even were we to accept FMC's position that a warranty disclaimer may not be declared unconscionable, we believe the trial court's decision was harmless error under the circumstances of this case. Subdivision (1) of section 2316 (see *ante,* fn. 8), which FMC admits is applicable, specifically provides that an express warranty takes precedence over an attempted disclaimer where the two are not reasonably reconcilable and where evidence of the express warranty is not precluded by the parol evidence rule. (See § 2202.) At trial, A & M attempted to prove that FMC breached both the implied warranty of fitness for a particular purpose (see § 2315) which may be negated by a conspicuous disclaimer (§ 2316, subd. (2)), and various express warranties made by FMC personnel which may not be disclaimed. But after our "examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), we do not think it reasonably probable the jury could have found breach of an implied warranty without also finding breach of an express one. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 625 [327 P.2d 897].) Under such circumstances, even had evidence of the disclaimer been before the jury, section 2316 would require them to disregard it where it conflicted with the express warranty.

Our conclusion that any error was harmless is supported by a record which contains more than ample evidence that FMC expressly warranted its weight-sizing machine would pack 1200-1250 cartons per hour. The major dispute in the testimony concerned what size cartons the warranty applied to. Thus, the question was not so much whether an express warranty had been made, but rather whether the warranty had been breached. In addition, there was no impediment to proof of the express warranty in view of the trial court's implied finding that the parties did not intend the preprinted form contract drafted by FMC to be the "final expression of their agreement with respect to such terms as are included therein . . . ." (§ 2202.)

(1971) 58 N.J. 522 [279 A.2d 640, 651].) Nevertheless, "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (*Williams* v. *Walker-Thomas Furniture Company* (D.C.Cir. 1965) 350 F.2d 445, 449, fn. omitted.) Phrased another way, unconscionability has both a "procedural" and a "substantive" element. (*Industralease Automated & Scientific Eq. Corp. V.R.M.B. Enterprises, Inc.* (1977) 58 App.Div.2d 482 [396 N.Y.S.2d 427, 431, fn. 4]; see also Leff, *supra*, 115 U.Pa.L.Rev. at p. 487; White and Summers, *supra*, § 4-3 at p. 151.)

The procedural element focuses on two factors: "oppression" and "surprise." (See U. Com. Code com. No. 1, 23A West's Ann. Cal. U. Com. Code, *supra*, § 2302, p. 198; *Geldermann and Company, Inc.* v. *Lane Processing, Inc.* (8th Cir. 1975) 527 F.2d 571, 575.) "Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." (*Williams* v. *Walker-Thomas Furniture Company, supra*, 350 F.2d at p. 449; *Fleischmann Distilling Corp.* v. *Distillers Co. Ltd.* (S.D.N.Y. 1975) 395 F.Supp. 221, 232; see Spanogle, *Analyzing Unconscionability Problems* (1969) 117 U.Pa.L.Rev. 931, 944-946.) "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. (See Ellinghaus, *In Defense of Unconscionability* (1969) 78 Yale L.J. 757, 764-765; Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2)* (1977) 65 Cal.L.Rev. 28, 43; Spanogle, *supra*, 117 U.Pa.L.Rev. at pp. 934-935, 943.) Characteristically, the form contract is drafted by the party with the superior bargaining position. (See Calamari and Perillo, Contracts (2d ed. 1977) § 9-40, p. 325.)

Of course the mere fact that a contract term is not read or understood by the nondrafting party or that the drafting party occupies a superior bargaining position will not authorize a court to refuse to enforce the contract. Although an argument can be made that contract terms not actively negotiated between the parties fall outside the "circle of assent"[11] which constitutes the actual agreement (see Eddy, *supra*,

---

[11]In the words of Professor Murray: "One of the fundamental concepts of contract law is the concept of *assent*. The basic idea that parties exercise their volition by committing themselves to future action and that the law provides their *circle of assent* with the status of a private law is fundamental to any discussion of contracts. The two basic questions raised are: (1) Did the parties agree to any future action or inaction? (2) If they did agree, what are the terms of their agreement (or, what is their circle of as-

65 Cal.L.Rev. at p. 43), commercial practicalities dictate that unbargained-for terms only be denied enforcement where they are also *substantively* unreasonable. (Ellinghaus, *supra*, 78 Yale L.J. at pp. 766-767; Murray on Contracts, *supra*, at pp. 748-749.) No precise definition of substantive unconscionability can be proffered. Cases have talked in terms of "overly harsh" or "one-sided" results. (See, e.g., *Schroeder* v. *Fageol Motors, Inc.* (1975) 86 Wn.2d 256 [544 P.2d 20, 23]; *Weaver* v. *American Oil Company* (1972) 257 Ind. 458 [276 N.E.2d 144, 146, 49 A.L.R.3d 306].) One commentator has pointed out, however, that "... unconscionability turns not only on a 'one-sided' result, but also on an absence of 'justification' for it." (Eddy, *supra*, 65 Cal.L.Rev. at p. 45), which is only to say that substantive unconscionability must be evaluated as of the time the contract was made. (See U. Com. Code, § 2-302.) The most detailed and specific commentaries observe that a contract is largely an allocation of risks between the parties, and therefore that a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. (Murray, *Unconscionability: Unconscionability* (1969) 31 U.Pitt.L.Rev. 1, 12-23; see also Eddy, *supra*, 65 Cal.L.Rev. at pp. 45-51; *Geldermann and Company, Inc.* v. *Lane Processing, Inc.*, *supra*, 527 F.2d at p. 576.) But not all unreasonable risk reallocations are unconscionable; rather, enforceability of the clause is tied to the procedural aspects of unconscionability (see *ante*, pp. 485-486) such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated. (See Spanogle, *supra*, 117 U.Pa.L.Rev. at pp. 950, 968.)

Although there is little California precedent directly on point, the importance of both the procedural and substantive elements of unconscionability finds support by analogy in the recent decision by the Supreme Court in *Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d 807.[12] Graham, a music promoter, booked concerts for a group of musicians incorporated under the name of "Scissor-Tail." A standard form con-

sent)?" (Murray on Contracts (2d ed. 1974) § 352, p. 743; first italics in original, second italics added.)

[12]Although the contract in *Graham* was not governed by the Uniform Commercial Code, and although much of the court's discussion is phrased in noncode terminology, the similarity of factors considered leads to the conclusion that unconscionability is a doctrine fundamental to the operation of contract law, irrespective of the particular application. In apparent recognition of this fact, the Legislature's belated decision to adopt Uniform Commercial Code section 2-302 codifies the unconscionability doctrine in Civil Code section 1670.5, applicable to all types of contracts, rather than as part of the Commercial Code. (See *ante*, p. 484.)

tract drafted by the musicians' union provided that the arbitrator for all contract disputes was to be selected by the union. Graham challenged enforcement of the clause, arguing that an arbitrator so selected was presumptively biased in favor of the musicians.

The court first determined that the contract was one of adhesion, noting that although Graham was a prominent and successful rock music promoter, the union—which represented nearly all significant musicians—mandated that promotion agreements be "negotiated" pursuant to standard union-prepared contracts. In language closely approximating the "unequal bargaining power" prong of the procedural unconscionability factor, the court concluded that Graham "... was required by the realities of his business as a concert promoter to sign [union] form contracts with *any* concert artist with whom he wished to do business ...." (*Graham*, supra, 28 Cal.3d at pp. 818-819, italics in original.)

Moving next to a discussion paralleling the "unfair surprise" prong of procedural unconscionability, the court determined that Graham was not surprised by the inclusion of the arbitration clause. It relied on the course of dealing between the parties as well as Graham's vast experience in the music industry in concluding that neither the inclusion of the arbitration clause nor its effect were outside of Graham's "reasonable expectations." (*Graham*, supra, 28 Cal.3d, at p. 821.)

Finally, in a discourse resembling substantive unconscionability analysis, the court indicated that "'contractual machinery [must] operate within some minimal levels of integrity.'" (*Graham*, supra, 28 Cal.3d, at p. 825, quoting *Hines* v. *Anchor Motor Freight* (1976) 424 U.S. 554, 571 [47 L.Ed.2d 231, 245, 96 S.Ct. 1048].) The contract in *Graham* did not attain this "minimal level" because the arbitration clause left the "adhering" party without any real and fair opportunity to prevail in the event of a contractual dispute. (*Ibid.*) In the language of substantive unconscionability, all the risks were allocated to Graham who was forced to accept the contract without negotiation. Not surprisingly, the court's conclusion denying enforcement to the arbitration clause on unconscionability grounds ties procedural and substantive elements together: "[W]e are of the view that the 'minimum levels of integrity' which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment—especially when, as here, the arrangement is the product of circumstances indicative of adhesion." (*Id.*, at pp. 826-827.)

## C

■ With these considerations in mind, we must now determine whether the trial court in this case was correct in concluding that the clauses in the FMC form contract disclaiming all warranties and excluding consequential damages were unconscionable. In doing so, we keep in mind that while unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question. (See *Royal Indemnity Co.* v. *Westinghouse Electric Corp.* (S.D.N.Y. 1974) 385 F.Supp. 520, 524; *Zicari* v. *Joseph Harris Co.* (1969) 33 App.Div.2d 17 [304 N.Y.S.2d 918, 925].) The business conditions under which the contract was formed directly affect the parties' relative bargaining power, reasonable expectations, and the commercial reasonableness of the risk allocation as provided in the written agreement. To the extent there are conflicts in the evidence or in the factual inferences which may be drawn therefrom, we must assume a set of facts consistent with the court's finding of unconscionability if such an assumption is supported by substantial evidence.

Turning first to the procedural aspects of unconscionability, we note at the outset that this contract arises in a commercial context between an enormous diversified corporation (FMC) and a relatively small but experienced farming company (A & M). Generally, "... courts have not been solicitous of businessmen in the name of unconscionability." (White and Summers, *supra*, § 4-9 at p. 170; see also, e.g., *Fleischmann Distilling Corp.* v. *Distillers Co. Ltd., supra*, 395 F.Supp. at p. 233.) This is probably because courts view businessmen as possessed of a greater degree of commercial understanding and substantially more economic muscle than the ordinary consumer. Hence, a businessman usually has a more difficult time establishing procedural unconscionability in the sense of either "unfair surprise" or "unequal bargaining power."

Nevertheless, generalizations are always subject to exceptions and categorization is rarely an adequate substitute for analysis. With increasing frequency, courts have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms (see, e.g., *Weaver* v. *American Oil Company, supra*, 276 N.E.2d 144; *Schroeder* v. *Fageol Motors, Inc., supra*, 544 P.2d at p. 24), and that even large business entities may have *relatively* little bargaining power, depending on the identity of the other contracting party and the commercial circumstances surrounding

the agreement. (See, e.g., *Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d at pp. 818-819; *Allen* v. *Michigan Bell Telephone Company* (1969) 18 Mich.App. 632 [171 N.W.2d 689, 693]; *Industralease Automated & Scientific Eq. Corp., etc., supra*, 396 N.Y.S.2d at p. 432.) This recognition rests on the conviction that the social benefits associated with freedom of contract are severely skewed where it appears that had the party actually been aware of the term to which he "agreed" or had he any real choice in the matter, he would never have assented to inclusion of the term. (See *Kugler* v. *Romain, supra*, 279 A.2d at p. 652.)

Both aspects of procedural unconscionability appear to be present on the facts of this case. Although the printing used on the warranty disclaimer was conspicuous (see *ante*, fn. 6), the terms of the consequential damage exclusion are not particularly apparent, being only slightly larger than most of the other contract text. Both provisions appear in the middle of the back page of a long preprinted form contract which was only casually shown to Abatti. It was never suggested to him, either verbally or in writing, that he read the back of the form. Abatti testified he never read the reverse side terms. There was thus sufficient evidence before the trial court to conclude that Abatti was in fact surprised by the warranty disclaimer and the consequential damage exclusion. How "unfair" his surprise was is subject to some dispute. He certainly had the opportunity to read the back of the contract or to seek the advice of a lawyer. Yet as a factual matter, given the complexity of the terms and FMC's failure to direct his attention to them, Abatti's omission may not be totally unreasonable. In this regard, the comments of the Indiana Supreme Court in *Weaver* v. *American Oil Company, supra*, 276 N.E.2d at pages 147-148 are apposite: "The burden should be on the party submitting [a standard contract] in printed form to show that the other party had knowledge of any unusual or unconscionable terms contained therein. The principle should be the same as that applicable to implied warranties, namely that a package of goods sold to a purchaser is fit for the purposes intended and contains no harmful materials other than that represented." (See also *Steele* v. *J. I. Case Company* (1966) 197 Kan. 554 [419 P.2d 902, 910].) Here, FMC made no attempt to provide A & M with the requisite knowledge of the disclaimer or the exclusion. In fact, one suspects that the length, complexity and obtuseness of most form contracts may be due at least in part to the seller's preference that the buyer will be dissuaded from reading that to which he is supposedly agreeing. This process almost in-

evitably results in a one-sided "contract." (See *Klein* v. *Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 97 [54 Cal.Rptr. 609].)

Even if we ignore any suggestion of unfair surprise, there is ample evidence of unequal bargaining power here and a lack of any real negotiation over the terms of the contract. Although it was conceded that A & M was a large-scale farming enterprise by Imperial Valley standards, employing 5 persons on a regular basis and up to 50 seasonal employees at harvest time, and that Abatti was farming some 8,000 acres in 1974, FMC Corporation is in an entirely different category. The 1974 gross sales of the Agriculture Machinery Division alone amounted to $40 million. More importantly, the terms on the FMC form contract were standard. FMC salesmen were not authorized to negotiate any of the terms appearing on the reverse side of the preprinted contract.[13] Although FMC contends that in some special instances, individual contracts are negotiated, A & M was never made aware of that option. The sum total of these circumstances leads to the conclusion that this contract was a "bargain" only in the most general sense of the word. (See *Steele* v. *J. I. Case Company, supra,* 419 P.2d at p. 909.)

Although the procedural aspects of unconscionability are present in this case, we suspect the substantive unconscionability of the disclaimer and exclusion provisions contributed equally to the trial court's ultimate conclusion. As to the disclaimer of warranties, the facts of this case support the trial court's conclusion that such disclaimer was commercially unreasonable. The warranty allegedly breached by FMC went to the basic performance characteristics of the product. In attempting to disclaim this and all other warranties, FMC was in essence guarantying nothing about what the product would do. Since a product's performance forms the fundamental basis for a sales contract, it is patently unreasonable to assume that a buyer would purchase a standardized mass-produced product from an industry seller without any enforceable performance standards. From a social perspective, risk of loss is most appropriately borne by the party best able to prevent its occurrence.

---

[13]The transcript of FMC salesman John Walker's testimony reads as follows:

"Q. All right. Now do you negotiate the terms of those contracts, or are they preprinted and that's the way you use them?

"A. They are sent by our legal department, with the exception of payment terms are negotiable, but not the 'Whereases' and Wherefores.

"Q. So you don't separately negotiate the terms on the back and the other terms, other than payment terms?

"A. I'm not empowered to do that, sir."

(*Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 [150 P.2d 456] (conc. opn. of Traynor, J.); *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618 [124 Cal.Rptr. 143]; Holmes, The Common Law (1881) p. 117.) Rarely would the buyer be in a better position than the manufacturer-seller to evaluate the performance characteristics of a machine.

In this case, moreover, the evidence establishes that A & M had no previous experience with weight-sizing machines and was forced to rely on the expertise of FMC in recommending the necessary equipment. FMC was abundantly aware of this fact. The jury here necessarily found that FMC either expressly or impliedly guaranteed a performance level which the machine was unable to meet. Especially where an inexperienced buyer is concerned, the seller's performance representations are absolutely necessary to allow the buyer to make an intelligent choice among the competitive options available. A seller's attempt, through the use of a disclaimer, to prevent the buyer from reasonably relying on such representations calls into question the commercial reasonableness of the agreement and may well be substantively unconscionable. The trial court's conclusion to that effect is amply supported by the record before us.

As to the exclusion of consequential damages, several factors combine to suggest that the exclusion was unreasonable on the facts of this case. Consequential damages are a commercially recognized type of damage actually suffered by A & M due to FMC's breach.[14] A party "... should be able to rely on their existence in the absence of being informed to the contrary, ..." (*Schroeder* v. *Fageol Motors, Inc., supra*, 544 P.2d at p. 24.) This factor is particularly important given the commercial realities under which the contract was executed. If the seller's warranty was breached, consequential damages were not merely "reasonably foreseeable"; they were explicitly obvious. All parties were aware that once the tomatoes began to ripen, they all had to be harvested and packed within a relatively short period of time. (See *Steele* v. *J. I. Case Company, supra*, 419 P.2d at p. 910; see also *Wille* v. *South-*

---

[14]In the absence of an exclusion, the code provides that consequential damages are generally recoverable. (§§ 2714, subd. (3) and 2715, subd. (2).) The general rule regarding limitations on available remedies was stated by the court in *Chemetron Corporation* v. *McLouth Steel Corporation* (N.D.Ill. 1974) 381 F.Supp. 245, 250: "While parties may agree to limit the remedies for breach of their contract, the policy of the Uniform Commercial Code disfavors limitations and specifically provides for their deletion if they would act to deprive a contracting party of reasonable protection against breach." (Fn. omitted.)

*western Bell Telephone Company* (1976) 219 Kan. 755 [549 P.2d 903, 908].)

Another factor supporting the trial court's determination involves the avoidability of the damages and relates directly to the allocation of risks which lies at the foundation of the contractual bargain. It has been suggested that "[r]isk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated." (*S. M. Wilson & Co.* v. *Smith Intern., Inc.* (9th Cir. 1978) 587 F.2d 1363, 1375.) But as we noted previously, FMC was the only party reasonably able to prevent this loss by not selling A & M a machine inadequate to meet its expressed needs.[15] (See *ante*, p. 491.) "If there is a type of risk allocation that should be subjected to special scrutiny, it is probably the shifting to one party of a risk that *only* the other party can avoid." (*Eddy, supra*, 65 Cal.L.Rev. at p. 47, italics in original.)

In summary, our review of the totality of circumstances in this case, including the business environment within which the contract was executed, supports the trial court's determination that the disclaimer of warranties and the exclusion of consequential damages in FMC's form contract were unconscionable and therefore unenforceable. When nonnegotiable terms on preprinted form agreements combine with disparate bargaining power, resulting in the allocation of commercial risks in a socially or economically unreasonable manner, the concept of unconscionability as codified in Uniform Commercial Code sections 2-302 and 2-719, subdivision (3), furnishes legal justification for refusing enforcement of the offensive result.

## IV

■ FMC claims that even if the disclaimer of consequential damages is invalid, the damage award should be set aside because it is speculative. Civil Code section 3301 provides that "[n]o damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." The general rule under this statute is that "... where the operation of an unestablished business is prevented or

---

[15]We recognize that a buyer may be able to restrict the *amount* of consequential damages, but the Code already imposes a duty to mitigate damages. (See § 2715, subd. (2)(a).) In any event there is no contention here that any actions by A & M artificially inflated the consequential loss suffered.

interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative." (*Grupe* v. *Glick* (1945) 26 Cal.2d 680, .693 [160 P.2d 832].) However, *Grupe*, which FMC cites, also stands for the exception to the rule: "[A]nticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." (*Ibid.*)

FMC does not argue on appeal that the evidence the trial court heard on the issue was itself speculative. That evidence included size of the crop and market price of the type of tomato A & M grew. Although A & M had never grown tomatoes before, Abatti was an experienced farmer. Moreover, the crop itself was in good condition at harvest time. There was no evidence of crop damage from harvesting to those tomatoes actually picked, nor was there any evidence that transportation of the crop would have posed a problem. These circumstances make the exception to the rule applicable and provide ample support for the trial court's decision to allow the award of consequential damages.

V

■ FMC asserts that A & M did not prevail on an action to enforce the written agreement and therefore that the trial court erred in awarding A & M attorney's fees under California reciprocal attorney's fee statute, Civil Code section 1717.[16] FMC relies on *McKenzie* v. *KaiserAetna* (1976) 55 Cal.App.3d 84 [127 Cal.Rptr. 275] in arguing that an action based on breach of either an express oral or implied warranty is not an action "to enforce the provisions of [the] contract" within the meaning of Civil Code section 1717 since the written contract which contains the attorney's fee provision says nothing about a warranty. (See also *Stout* v. *Turney* (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637, 586 P.2d 1228]; *Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 27-28 [147 Cal.Rptr. 655].)

The underlying merits of *McKenzie* to one side (compare *Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 37 [161 Cal.Rptr. 516]), FMC com-

---

[16]That section provides in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract, shall be awarded either to one of the parties, or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements."

pletely misreads the case. *McKenzie* involved an action presented to the jury on alternative theories of breach of express warranty, breach of implied warranty and negligent misrepresentation. The jury returned a general verdict in plaintiff's favor. The court concluded that "... negligent misrepresentation is not an action to enforce the provisions of a contract. As the jury may have awarded its verdict to appellant on the basis of the negligent misrepresentation theory, appellant cannot recover attorney's fees under section 1717." (*McKenzie, supra,* 55 Cal. App.3d at p. 89.)

Since this case was not presented to the jury on a negligent misrepresentation theory, the holding in *McKenzie* is simply inapplicable. In fact, *McKenzie* can reasonably be read to support the trial court's action here in its implicit suggestion that a jury verdict based on breach of an expressed or implied warranty would have supported the attorney's fee award. (*Ibid.*) That implicit conclusion is entirely correct. The fact that a warranty is not stated in the written memorandum does not mean it is not part of the contract. Section 1201, subdivision (11) of the California Uniform Commercial Code itself defines "contract" broadly to include anything which affects the legal obligation of the parties.[17] The parties' "total legal obligation" may be a composite of written terms, oral expression and responsibilities implied by law. All may be enforced by an "action on [the] contract," and the trial court here correctly concluded that Civil Code section 1717 allowed A & M's recovery of attorney's fees.[18]

## VI

■ As its final contention, FMC challenges the trial court's exercise of discretion under Civil Code section 3287, subdivision (b), in awarding prejudgment interest to A & M.[19] Relying on the complex nature of

[17]That subdivision reads: "'Contract' means the total legal obligation which results from the parties' agreement as affected by this code and any other applicable rules of law."

[18]In view of the fact that FMC prevailed on its cross-complaint, we see nothing to preclude application of the same rule in FMC's favor for the portion of its attorney's fees incurred in prosecuting the cross-complaint. It is, of course, for the trial court to determine, on proper application, the reasonable value of the services rendered on that part of the case.

[19]Subdivision (b) of Civil Code section 3287 provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

the case, the previous jury verdict in favor of FMC which was overturned after the court in the second trial granted A & M's motion for a new trial,[20] and the fact that the exact amount of A & M's damages was in dispute, FMC argues that the award of prejudgment interest was inappropriate.

Before 1967, Civil Code section 3287 (now subd. (a) of that section) provided for the recovery of prejudgment interest only where damages were "... certain, or capable of being made certain by calculation ...." A 1967 amendment added subdivision (b) which, in contrast to the mandatory nature of subdivision (a), granted *discretion* to the trial court to allow prejudgment interest even in cases where the amount of damages was "unliquidated." Thus, by its very terms, subsection (b) was designed to allow trial courts flexibility in circumstances like those in the present case where the exact amount of damage is in dispute. (See *Moreno* v. *Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 448 [123 Cal.Rptr. 393]; *Zalk* v. *General Exploration Co.* (1980) 105 Cal.App.3d 786, 794-795 [164 Cal.Rptr. 647].)

Few cases have discussed the standards by which a trial court's exercise of discretion under Civil Code section 3287, subdivision (b) are to be judged. (See generally *Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1065 [98 Cal.Rptr. 153].) Nonetheless, we believe several of the factors cited by the trial court support its decision to award prejudgment interest here. First, over seven years passed between the time A & M filed its first complaint and the time judgment was entered. The fact that the hung jury in the first trial or the granting of the new trial motion after the second trial was not FMC's "fault" is irrelevant. The award of 7 percent interest to A & M does not penalize FMC for litigating a bona fide dispute; rather, it is merely a recognition of an additional amount of damage incurred by A & M as a result of FMC's breach of warranty. The judgment in this action reflects a conclusion that FMC was liable to A & M for the economic loss of A & M's 1974 tomato crop. Were the judicial process devoid of transaction costs, A & M would have been entitled to reimbursement in 1974. FMC can hardly complain that these transaction costs have essentially allowed it to borrow over $325,000 from A & M for 7 years at 7 percent per year. The trial court was permitted to take cognizance of the exceedingly higher market interest rates during this period in exercising its discretion to award prejudgment interest.

---

[20]This characterization is a bit misleading. The jury in the second trial determined that FMC had breached its warranty to A & M but concluded that this breach was not the cause of A & M's damages. The trial judge found the jury's reasoning inconsistent on the facts of the case and granted A & M's motion for a new trial.

In addition, A & M's 1974 offer to settle the case provides more support for the trial court's conclusion. In June of that year, A & M offered to return the weight-sizer to FMC if FMC would refund the down payment and pay the freight charges. To be sure, FMC was free to refuse this offer in good faith reliance on its position that the disclaimers and exclusions on the preprinted form contract made A & M's claim untenable. In our view, however, the trial court was permitted to view FMC's refusal of A & M's offer as placing the prejudgment interest amount at risk. (Compare *Elliano* v. *Assurance Co. of America* (1975) 45 Cal.App.3d 170, 182-183 [119 Cal.Rptr. 653].) It having been determined that A & M's claim was valid, the trial court properly exercised its discretion in awarding prejudgment interest.

*Disposition*

The judgment is affirmed.

Reed, J.,* concurred.

**STANIFORTH, Acting P. J.**—I concur for the following reasons:

The trial court found the FMC form contract clauses disclaiming warranties and limiting damages were unconscionable. The issue on appeal is whether this finding is supported by substantial evidence. If the trial court's application of the doctrine of unconscionability is supported by substantial evidence, it was correct in keeping the reverse side of the contract from the jury. (See Civ. Code, § 1670.5 and comments.)

Facts fly as "thick as autumnal leaves that strow the brooks of Vallombrosa," in support of the trial court's conclusion these contract clauses were oppressive, contrary to oral representations made to induce the purchase, and unreasonably favorable to the party with a superior bargaining position. No experienced farmer would spend $32,000 for equipment which could not process his tomatoes before they rot and no fair and honest merchant would sell such equipment with representations negated in its own sales contract.

A petition for a rehearing was denied September 24, 1982, and appellant's petition for a hearing by the Supreme Court was denied December 15, 1982. Richardson, J., was of the opinion that the petition should be granted.

*Assigned by the Chairperson of the Judicial Councill.

## APPENDIX

CONDITIONAL SAL CONTRACT
SECURITY AGREEMENT

 FMC CORPORATION
XXXXXXXXXXXXXX - SAN JOSE
Agricultural Machinery Div.

NAME OF BUYER  A. & M. PRODUCE COMPANY, INC.

BUYER'S BILLING ADDRESS  P. O. BOX 100, EL CENTRO, CA  92243          714 353-1972

Number    Street    City    State    Phone Number

The undersigned Buyer ("BUYER") hereby agrees to purchase from FMC Corporation, Agri-

cultural Machinery Division, P.O. Box 145, San Jose, CA 95103 _____ (Dealer Address)

Dealer Name

("SELLER"), and SELLER hereby agrees to sell to BUYER, UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND BACK HEREOF, the equipment described below and/or on the specification sheets attached hereto and made a part hereof ("EQUIPMENT"), as follows:

| QUANTITY | DESCRIPTION | TOTAL |
|---|---|---|
| One | 4 Lane 6 Size Weight Sizer, f.o.b. Yakima and | |
| One | 2 Lane 6 Size Weight Sizer, f.o.b. Yakima, WA | 14,571.00 |
| | Material & Equipment as per attached specification | |
| | Sheet dated 2/27/74, f.o.b. Lindsay, CA | 15,945.00 |
| | | 10,516.00 |
| | 5% California Sales Tax | 1,525.80 |

1. CASH PRICE ........................................ $ 32,041.80                    $32,041.80
2. LESS: CASH DOWN PAYMENT ____ $ 5,680.60
3. ~~TRADE IN~~ Previously Paid 5,000.00
4. TOTAL DOWN PAYMENT ____ $10,680.60 $ 10,680.60
5. UNPAID BALANCE OF CASH PRICE ____ $ 21,361.20
6. OTHER CHARGES:
   ____ $
   ____ $
7. ~~XXXXXXXXXXX~~ (UNPAID BALANCE) ____ $ 21,361.20
8. FINANCE CHARGE (APPLIES FROM ____) $
9. TOTAL OF PAYMENTS ____ $
10. DEFERRED PAYMENT PRICE ____ $
11. ANNUAL PERCENTAGE RATE ____ %
BUYER agrees to pay to SELLER said total of payments of $ 21,361.20 as follows:

(1) On Delivery of Equipment. _____ 19____

(2) ____, ____ 19____

NOTICE TO BUYER: YOU HAVE A RIGHT TO PAY IN ADVANCE THE UNPAID BALANCE OF THIS AGREEMENT AND OBTAIN A PARTIAL REFUND (CREDIT) OF THE FINANCE CHARGE BASED ON THE "ACTUARIAL METHOD." YOU ARE ENTITLED TO A COPY OF THE CONTRACT YOU SIGN.

SELLER retains, and BUYER grants to SELLER, a security interest in EQUIPMENT.

Delinquent payments shall bear interest from maturity at the highest lawful contract rate.

NOT APPLICABLE          ASSIGNMENT AND GUARANTEE

For value received the undersigned, being the seller named in this Conditional Sale Contract ("Agreement"), sells, assigns and transfers to John Bean Division, FMC Corporation ("Assignee") the Agreement, together with all sums due and to become due thereon, as well as all rights which the undersigned has, by reason of the Agreement, against the buyer named therein and against the property described therein. The undersigned warrants that the property described in the Agreement is, with the exception of the Agreement, free and clear of all liens and encumbrances and that the Agreement is genuine, valid and subsisting and free from defenses and offsets, and arises out of a bona fide sale as therein described. The undersigned further warrants that its signature is genuine and said property has been delivered in good order to and accepted by said buyer. The undersigned, in consideration of the pur-

chase of the Agreement by Assignee, unconditionally guarantees, without right of revocation, the prompt and complete payment of the indebtedness of said buyer under the Agreement and waives notice of said buyer's default or the exercise by the Assignee of any right under the Agreement and consents to any extension of time of payment or other indulgence granted by Assignee.

Dated _____  By _____

_____

Invoice Number(s) _____
billed to you by John Bean Division.

BUYER'S RECEIPT OF ASSIGNMENT

The undersigned, being the buyer named in the foregoing Conditional Sale Contract, hereby acknowledges receipt of notice of the assignment of said "Contract" to John Bean Division, FMC Corporation and agrees to make all payments required thereunder directly to John Bean Division, FMC Corporation.

Dated _____                    By _____

Receipt of an executed copy of this CONDITIONAL SALE CONTRACT is hereby acknowledged.

FMC Corporation
(Signed) Agricultural Machinery Division
(Signature of Selling individual; typed name of Seller if other than individual)

By _____ (L. S.)
(Signature & title if Seller is not individual)

PLEASE USE INK
ORIGINAL SIGNATURES REQUIRED COPIES

By _____ (L. S.)
(Signature of Buyer if individual; typed name of Buyer if other than individual)

By _____ (L. S.)
(Signature & title if Buyer is not individual)

_____ (Signature of Co-buyer)

Seller's Address  P. O. Box 145
San Jose, CA  95103

_____ (Witness)

Date Executed by Seller  February 26, 1974                    Date Executed by Buyer _____ 19__

## (reverse side)
## TERMS AND CONDITIONS

**1. TITLE.**
Title to the equipment covered by this contract, and to all additions or accessions thereto and substitutions therefor, shall remain in Seller as a security interest until Buyer has completed payment of the purchase price, plus accrued interest, and fully performed all of the terms and conditions hereof.

**2. PROTECTION OF SELLER'S SECURITY INTEREST.**
The equipment shall remain strictly personal property, irrespective of the mode of its attachment to realty, the consequences of its being disturbed or removed, or the use made thereof; and Buyer shall not sell, mortgage, pledge or otherwise deal in or encumber the equipment or any part thereof or permit the same to be removed for periods of more than thirty days from the place designated on the face hereof where it will be kept when not in use (so long as any portion of the purchase price or accrued interest remains unpaid), without Seller's prior written consent.

**3. SELLER'S REMEDIES.**
In the event that Buyer fails to make any payment hereunder when due, or otherwise defaults in the performance of the terms and conditions hereof, or if a receiver or trustee of Buyer's property or business is appointed by any court, or if a proceeding in bankruptcy or insolvency is instituted by or against Buyer (and not dismissed within sixty days), or if Buyer makes an assignment for the benefit of creditors, or if for any other reason Seller deems itself to be insecure hereunder, the entire amount unpaid hereunder shall become immediately due and payable, at Seller's option.

In such event, Seller may take immediate possession of the equipment (including all additions or accessions thereto and substitutions therefor), without notice, demand or legal process and without liability to Buyer for any damages or otherwise for so doing. For the purpose of taking possession of the equipment, Seller may enter upon any premises where the equipment may be. Seller may also require Buyer to assemble the equipment and deliver it to Seller at such place as Seller may designate which is reasonably convenient to Seller and Buyer, and Buyer agrees to do so when so required by Seller. Seller may resell the equipment at public or private sale, upon such terms as Seller may determine, with or without notice to Buyer, and with or without having the equipment at the place of sale. Seller may bid at any public sale. From the proceeds of any such sale Seller shall deduct all expenses of retaking, storing and selling the equipment, including the cost of repairs and any other reasonable costs of preparing the property for sale. The balance of the proceeds shall be applied to the total amount due hereunder. In case of deficiency, Buyer shall pay the same with interest.

If Seller retains an attorney to enforce Seller's rights hereunder, Buyer shall pay reasonable attorney's fees to Seller in connection therewith.

The rights and remedies herein granted to Seller are not exclusive but are in addition to any other rights and remedies granted to Seller by law, including without limitation all rights and remedies available to Seller under the Uniform Commercial Code.

**4. WARRANTY.**
Seller makes no warranties as to the equipment, except (as to new equipment only, all used equipment being sold "AS IS") the new equipment warranty of John Bean Division of FMC Corporation ("John Bean"), as follows:

John Bean warrants new equipment of its manufacture to be free from defects in material and workmanship under normal use and service for warranty periods as follows;

A. Ninety days from date of delivery to the original purchaser of Spartan Sprayers, Spartan pumps (61 pump), Trojan Sprayers, Farm Sprayers with pump mounted on PTO shaft of tractor, Farm Sprayer Kits (except Royalette and Royaller farm sprayer pumps), Mater-Flow pumps, and service parts or accessory equipment, such as, but not limited to, spray guns, spray hose, refiler attachments, hose reels, and potato harvester attachments not purchased with a complete machine.

B. Six months from the date of delivery to the original purchaser for Royalette, Royaller and Royal pumps not factory installed into a complete machine.

C. Twelve months from the date of delivery to the original purchaser, or 500 hours of use, whichever occurs first, for all other complete John Bean-built machines.

Tires and tubes, pressure gauges, batteries, engines and other items not manufactured by John Bean are covered only by the warranty of the manufacturer.

John Bean's obligation under this warranty is limited to repairing or replacing any part of the equipment, which is found to be defective, provided that (i) such defect is reported to John Bean within such warranty period, (ii) such part is, upon request, returned to John Bean's factory where the equipment was manufactured, transportation prepaid, and (iii) Buyer prepays charges for transportation of such part (when repaired) or any replacement therefor from John Bean's factory to Buyer. This warranty does not cover the results of ordinary wear and tear; nor does it cover any part damaged by neglect, misuse, accident, excessive deterioration due to corrosion from any cause, improper operation or maintenance, or any part damaged in the course of or as the result of installation, modification or adjustment performed by anyone other than John Bean or its authorized representative. This warranty does not cover any equipment repaired by anyone other than an authorized representative of John Bean or by the use of any replacement part inferior to the original part, if such repair adversely affects the performance or quality of the equipment.

Except as expressly provided herein, John Bean shall not be liable to Buyer for damages of any kind or nature occasioned by or arising out of the installation, operation, use, misuse, nonuse, repair or replacement of the equipment, or out of the use of any method or process for which the same may be employed.

In the event, notwithstanding the terms of this agreement, it is determined by a court of competent jurisdiction that an express warranty has been given by John Bean to Buyer with respect to the speed, capacity or other like performance characteristics of the equipment, John Bean's liability for breach of the same shall be limited to accepting return of such equipment FOB plant of manufacture, refunding any amounts paid thereon by Buyer (less depreciation at the rate of 20% per year if Buyer has used the equipment for more than 30 days) and canceling any balance still owing on the equipment.

THERE ARE NO UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTCULAR PURPOSE, NOT EXPRESSLY SET FORTH HEREIN, AND SELLER SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**5. DISCLAIMER OF CONSEQUENTIAL DAMAGES.**
SELLER IN NO EVENT SHALL BE LIABLE FOR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING WITHOUT LIMITATION BREACH OF ANY OBLIGATION IMPOSED ON SELLER HEREUNDER OR IN CONNECTION HEREWITH. CONSEQUENTIAL DAMAGES FOR PURPOSES HEREOF SHALL INCLUDE, WITHOUT LIMITATION, LOSS OF USE, INCOME OR PROFIT, OR LOSSES SUSTAINED AS THE RESULT OF INJURY (INCLUDING DEATH) TO ANY PERSON, OR LOSS OF OR DAMAGE TO PROPERTY (INCLUDING WITHOUT LIMITATION PROPERTY HANDLED OR PROCESSED BY THE USE OF THE EQUIPMENT). BUYER SHALL INDEMNIFY SELLER AGAINST ALL LIABILITY, COST OR EXPENSE WHICH MAY BE SUSTAINED BY SELLER ON ACCOUNT OF ANY SUCH LOSS, DAMAGE OR INJURY.

**6. CONTINGENCIES.**
Seller shall not be liable to Buyer for any loss or damage suffered by Buyer, directly or indirectly, as a result of Seller's failure to deliver or delay in delivering the equipment or failure to perform, or delay in performing, any other term or condition hereof, where such failure or delay is caused by fire, flood, natural disaster, labor trouble (including without limitation strike, slowdown, and lockout), war, riot, civil disorder, embargo, Government regulations or restrictions of any and all kinds, expropriation of plant by federal or state authority, interruption of or delay in transportation, power failure, inability to obtain materials and supplies, accident, explosion, act of God, or other causes of like or different character beyond Seller's control.

**7. RISK OF LOSS.**
The risk of loss or destruction of, or damage to, the equipment shall be on Buyer from and after delivery thereof to Buyer or carrier. The equipment shall be insured by Buyer at its own expense against loss or damage by fire and the other causes covered by the extended coverage endorsement, in an amount not less then the total of payments due to Seller hereunder, with loss, if any, payable to Seller and Buyer as their respective interests may appear. The policy or policies of insurance shall be written in a form acceptable to Seller and shall provide for ten days minimum written cancellation notice to Seller. Buyer shall promptly furnish Seller with a certificate of insurance issued by the insurer on each policy. In the event that the equipment is destroyed or damaged by fire or any other cause whatever, whether within or without Buyer's control, Buyer nevertheless shall be liable to Seller for the full amount of the unpaid purchase price, plus accrued interest, but any insurance paid to Seller on account of any such destruction or damage shall be credited against unpaid purchase price.

**8. PATENTED PROCESS.**
The purchase of the equipment does not entitle Buyer to employ the same with any patented process owned by Seller or others, except where Buyer is expressly authorized to use such process.

**9. PATENT INFRINGEMENT.**
Except in the case of articles, materials and designs furnished or specified by Buyer, Seller, at its own expense, shall defend any suit brought against Buyer on the ground that use of the equipment furnished hereunder by Seller, infringes any existing United States Letters Patent, and shall pay the amount of any judgment that may be awarded against Buyer in any such suit, provided and upon condition that Buyer shall have made all payments due under this agreement and shall (a) promptly deliver to Seller all infringement notices and other papers received by or served upon Buyer, (b) permit Seller to take complete charge of the defense of such suit and to compromise the same, if deemed advisable, and (c) assist in every reasonable way in the conduct of such defense.

In the event that Buyer shall be enjoined by a court of competent jurisdiction from which no appeal can be taken from using the equipment for the intended purpose on the ground that use of the equipment infringes an existing United States Patent, or it is established to Seller's satisfaction, upon due investigation, that use of the equipment infringes an existing United States Patent, Seller, at its option, may either (a) procure for Buyer a license to continue using the equipment, (b) modify the equipment so as to make it noninfringing without seriously impairing its performance, (c) replace the equipment with equipment that is substantially the equivalent but noninfringing, or (d) remove the equipment from Buyer's plant, in which event Seller shall refund to Buyer the purchase price less depreciation at the rate of 20% per year. The foregoing sets forth Seller's entire liability to Buyer for patent infringement based on the possession and use of the equipment; it being understood and agreed that the aforesaid obligations of Seller do not extend to, and are not applicable in the case of, any patent infringement claims directed to a method or a process and that as to such claims Seller has no obligation whatsoever.

Buyer agrees to defend and indemnify Seller against any claims or liabilities for, or by reason of, the infringement of any United States Patent arising from the manufacture of any of the equipment in accordance with specifications furnished by Buyer or the sale thereof.

**10. TAXES.**
Property taxes assessed against the equipment shall be paid by Buyer. Should any tax assessment become delinquent, Buyer shall promptly so notify Seller; and any payment made by Seller to discharge such assessment shall become part of the purchase price and be secured by and under this contract.

**11. PROMISSORY NOTES.**
At Seller's option, any unpaid balance hereunder shall be evidenced by a note or notes bearing interest as herein specified; but the acceptance of notes by Seller shall not constitute payment hereunder or divest Seller of its security interest in the equipment.

**12. ADDITIONAL CHARGES.**
If substitute or additional equipment, or repair parts, are purchased by Buyer from Seller, the terms and conditions of this contract shall be applicable thereto, the same as if such substitute or additional equipment, or repair parts, had been originally purchased hereunder.

**13. NON-WAIVER.**
Waiver by Seller of any default hereunder of Buyer shall not be construed as a waiver of any prior or subsequent default.

**14. CANCELLATION CHARGES.**
This agreement is subject to cancellation by the Buyer at any time prior to delivery of the equipment, but only upon payment to the Seller of reasonable cancellation charges, which shall take into account expenses already incurred and commitments made by the Seller and the Seller's anticipated profit.

**15. APPROVAL.**
This agreement shall not be binding on the Seller unless and until approved by an officer or other authorized representative of the Seller in the place provided on the face of this agreement.

**16. TRADE-IN ALLOWANCE.**
Trade-in allowances are made by the Seller upon receipt of trade-in equipment FOB the factory at which originally manufactured.