[Civ. No. 2089. Fifth Dist. Aug. 4, 1975.]

MANLIO MORENO, Plaintiff and Respondent, v.
JESSUP BUENA VISTA DAIRY, Defendant and Appellant.

COUNSEL

Wagy, Bunker, Hislop & Lewis and Bruce F. Bunker for Defendant and Appellant.

Vizzard, Baker, Sullivan, McFarland & Long for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.***—Appellant Jessup Buena Vista Dairy, a corporation, appeals from a judgment in a declaratory relief action in which the court decreed that a certain asset, a milk pool quota, was an asset of a partnership between respondent, the plaintiff below, and appellant, the defendant below, and directed the value of such milk pool quota be appraised in accordance with the provisions set forth in the partnership agreement. Both parties also appeal from an order of the court granting prejudgment interest from the time of judgment.

The appellant and respondent entered into a partnership agreement in 1967 to conduct a dairy known as the Buena Vista Dairy. The respondent, Manlio Moreno, had been an employee of Jessup Farms, a partnership which operated various dairy farms and engaged in other business activities related to the milk industry. As such an employee he had been in charge of the management of a large dairy herd belonging to Jessup Farms. His expressed intention to leave their employment and the desire to retain his services apparently led to the creation of a partnership between Moreno and Jessup Buena Vista Dairy, a corporation, formed by those persons who operated Jessup Farms. Articles of co-partnership were drawn up by appellant, which respondent Moreno signed without alteration. The partnership agreement provided that the Jessup Buena Vista Dairy should have an 80 percent interest in the partnership and Moreno a 20 percent interest. Each was required to contribute a proportionate share of the capital assets, chiefly dairy cows. At or about the same time that the partnership agreement was signed, a milk contract was signed between the Buena Vista Dairy partnership as a milk producer and Glen Farms, Inc. (another Jessup interest) as a distributor. This contract provided that Glen Farms, Inc. agreed to purchase specified quantities of milk from the partnership at agreed prices for a 10-year period. The contract further provided that Glen Farms, Inc. was purchasing Class I milk, the highest grade of milk bringing the highest prices.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

In October, 1970, respondent gave notice of his intention to withdraw from the partnership, and pursuant to the partnership agreement appellant corporation gave notice of its election to purchase respondent's interest.

The proposed dissolution of the partnership brought into conflict the opposing interpretations by the parties of the following significant provisions of the partnership agreement which we must quote *in extenso* for their proper evaluation.

"V. 1(a) If the remaining partner elects to purchase the interest of the retiring partner, he or it shall serve upon the retiring partner, notice of his or its election to purchase the retiring partner's interest. The purchase price to be paid and the manner of payment is more particularly hereinafter set forth in Article VI of this Agreement.

"(6) *Other Grounds for Termination*

(a) In the event of any milk-pooling legislation or other legislation which would affect the contract rights of this partnership, either party shall have the right, on a sixty (60) day notice to the other, to terminate this Partnership Agreement; and on such termination by either party, Corporation shall have the right to purchase Individual's share of this partnership, the purchase price and manner of payment to be such as is more particularly hereinafter set forth in Article VI of this Agreement. In the event Corporation does not, within sixty (60) days from the date it receives such notice or gives such notice, elect to purchase Individual's share, then the partnership shall proceed with reasonable promptness to liquidate the business of the partnership. In said event, all of the assets of the partnership business shall be sold, and all of the obligations of the partnership shall be paid; and the remaining assets, if any, shall then be distributed to, the partners in the proportion that each of the partners share in the net profits or losses of the partnership, as hereinabove provided.

"VI. (1) *Amount of Payment:* The parties shall attempt to agree as to the one hundred percent (100%) value of the partnership, and in such determination, no value shall be placed on any milk contract or leasehold interest with [*sic*] the partnership has. In the event the parties are able to agree as to the one hundred percent (100%) value of the partnership, then the amount to be paid to the partner who is leaving the partnership shall be the percentage of the one hundred percent (100%)

value of the partnership that said partner shares in the profits or losses of the partnership. In the event the parties cannot agree within twenty (20) days from the date of the election of a partner to continue the partnership, then the partnership assets shall be appraised and the value of one hundred percent (100%) of the partnership assets shall be arrived at, again, without any valuation being placed on any milk contract or leasehold interest which the partnership has. In the event the parties cannot, within thirty (30) days from the date of the election of a partner to continue the business of the partnership, agree as to an appraiser, then each of the parties shall appoint an appraiser, and a third appraiser shall be selected by ROBERT MC CUNE, Paramount, California, or if he refuses or fails to do so within five (5) days after he is requested to do so, an agriculture field man from any bank that does not represent either party shall be selected; and if, for any reason, the third appraiser is not appointed within forty-five (45) days from the date of the election of a partner to continue the partnership business, then either appraiser appointed by the parties may apply to the American Arbitration Association for the appointment of a third appraiser; and any such appraiser, so appointed, shall, for the purposes of this subparagraph, be a validly appointed appraiser. The decision of any two (2) appraisers so appointed shall be binding on the parties; and once a one hundred percent (100%) value of the partnership business has been so established, the partner who is leaving the partnership shall be entitled to be paid the percentage of said amount that such person shares in the net profits and net losses of the partnership; and judgment upon said amount may be entered in any court having jurisdiction thereof.

"(2) *Manner of Payment:* It is agreed by the parties that said payment shall, within ninety (90) days of the establishment of the amount thereof, be paid in cash." (Exhibit No. 1).

There is no serious dispute that the foregoing contract provisions as they relate to milk contracts must be considered against the backdrop of the milk industry and the governmental and commercial regulations and practices affecting it.

At the time of the creation of the partnership producers of milk were dependent upon having a milk contract with a milk distributor, since without such a contract a producer would have no outlet for his milk. At the time the partnership agreement was in preparation and was executed it was generally known that the Legislature was considering an overhauling of the laws relating to milk production and distribution. While it is

not disputed that a milk contract with a distributor had some value, opinions as to said value differ greatly, the respondent placing it at from virtually nothing to $100 per cow, the appellant testifying that such a contract as that held by the partnership with Glen Farms, Inc. was worth $612.50 a cow. The respondent testified his opinion was based upon the legislative uncertainties existing at the birth of the partnership so that he could not consider that the milk contract had any substantial value.

On July 1, 1969, a legislative enactment establishing a milk pooling system became operational. Under said system each producer was assigned a production base and a milk pool quota based upon the production history of the producer's herd, either during the last half of 1966 or all of 1967. Ownership of the herd was not a consideration. The partnership selected the year 1967 as its base period and received an original assignment of 703.97 pounds of milk quota (per cow). Subsequently the partnership in February 1970 acquired from Jessup Farms, for no consideration, an additional quota of 81.63 pounds of quota.

With the establishment of milk pool quota, milk contracts, or shipping contracts (as appellant and his witnesses preferred to call them), became valueless as the producer was virtually guaranteed a market for his milk. On the other hand, milk pool quotas had a substantial value and could be sold with or without a transfer of the cows upon which the quota was originally based.

With this outline of the historical and factual background we turn to an analysis of the contentions of the parties. It is basically the contention of appellant that the partnership agreement unequivocally requires the interpretation that the milk pool quota established in 1969 is *sui generis* with the term "milk contract" referred to in the partnership agreement, and therefore by the provisions of the partnership agreement no value should be assigned to the milk pool quota in determining the partnership assets. The respondent contends otherwise and the court below so found, directing that their values be determined by arbitration as prescribed in the partnership agreement and included in the partnership distribution. The parties had prior to the commencement of the action reached full agreement as to other partnership assets.

We shall discuss appellant's and respondent's contentions on appeal as to the fixing of interest as of the time of judgment at a later time.

We note preliminarily that our task is to determine whether or not the findings of fact and the conclusions of law drawn therefrom are supported by the evidence. We are not confronted with the task of reinterpreting the partnership agreement here in question for the court properly received conflicting extrinsic evidence in aid of its interpretation. For example, the court received, as we have previously noted, sharply conflicting testimony as to the value of the milk contract, a crucial element to be considered in determining the intent of the parties at the time of the making of the contract. As was said in *Rabinowitch* v. *Cal. Western Gas Co.,* 257 Cal.App.2d 150 at page 157 [65 Cal.Rptr. 1]: "We should not have been bound by a construction of the lease made by the trial court if there had been no resort to extrinsic evidence or no conflict in that evidence. (*Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Here the trial court was compelled to resort to extrinsic evidence to ascertain the intention of the parties; that evidence proved to be in conflict. Therefore, we are bound by the interpretation of the trial court where, as we have related, there was substantial extrinsic evidence to support the findings and judgment. (*Parsons* v. *Bristol Dev. Co., supra,* at p. 866, fn. 2; *Leoke* v. *County of San Bernardino* (1967) 249 Cal.App.2d 767, 772 [57 Cal.Rptr. 770].)"

The appellant caused the partnership agreement to be drawn up. If it failed to clearly spell out the meaning of the term "milk contract" it must bear the responsibility. But we do not rest our argument upon that point. The obvious fact is that the Legislature by creating milk quotas created a heretofore nonexistent right, the right to share in the milk pool quota in accordance with the number of cows in the herd of a particular producer at a particular time. When the Legislature adopted the milk pool quota system it created something vastly different than the shipping rights theretofore existing and the 10-year contract between the copartnership and Glen Farms, Inc. ceased to have even the minimal value contended for by respondent.

We cannot accept, as could not the trial court, that it was "inescapable" that the only meaning of the phrase "milk contracts" in the copartnership agreement was synonymous with "milk quota." If the positions of the parties were reversed and the respondent were acquiring the partnership interest of appellant we strongly doubt that appellant would contend for an interpretation that no value would be placed on a "milk contract" or anything analogous thereto. Such an interpretation in such a situation would mean that appellant would be giving up approximately $360,000 as represented by the value of $600 per cow as related to the milk pool quota.

The subsequent conduct of the parties may of course be considered by the court in the interpretation of an agreement and evidence was offered to do just that. However, the evidence offered was at best unconvincing and possibly even preponderating in favor of respondent. The fact that appellant submitted a financial statement wherein the milk pool quota was assigned a value and was attributed 80 percent to the corporate partner and 20 percent to the respondent is not entirely explained away by the appellant's testimony that the financial statement was prepared by the lender, inasmuch as the lender could only have known what he was told by appellant.

Appellant's argument that respondent is estopped to assert an interpretation contrary to that contended for by appellant is based upon a misconception of the doctrine of estoppel in pais. The argument is premised upon a conversation testified to by Dr. Jessup, the corporate president. Respondent, upon being told that it was the appellant's interpretation of the contract that respondent had no interest in the milk pool quota, remained silent. The alleged silence of respondent forms the basis of a claim by appellant that he relied to his detriment upon such silence.

No estoppel appears. Dr. Jessup was stating a legal opinion upon a matter on which he was as fully informed as respondent and respondent's silence in no way misled him. Even more importantly respondent's silence did not cause appellant to change his position to his detriment, nor is there any showing that it was intended to do so.

Appellant argues that respondent would be unjustly enriched if he is awarded the 20 percent share of the milk pool quota the trial court awarded him. Appellant fails to accept the fact that it was the partnership, not the respondent, who received the benefits of the milk pool quota legislation. It was the Legislature which created the milk quota system and the benefits flowed from that fact. The appellant, although anticipating some legislation in the milk quota area, failed to draw up an agreement which would have insured for itself all of the benefits from the milk quota system or any other legislative enactment. Nor are we advised that respondent would have entered into any agreement had he understood it in the terms for which appellant contends. If appellant made a bad bargain, it was a bargain not driven home by respondent who was in a vastly inferior bargaining position. As is stated in 17 Am.Jur.2d, Contracts, section 242, pages 627-629: "It is a fundamental principle that a court may not make a new contract for the

parties or rewrite their contract under the guise of construction. In other words, the interpretation or construction of a contract does not include its modification or the creation of a new or different one. . . . Courts cannot make for the parties better or more equitable agreements than they themselves have been satisfied to make, or rewrite contracts because they operate harshly or inequitably as to one of the parties . . . "

■ We find no error in the court's refusing to make special findings as requested by appellant. In accordance with rule 232(d) of the California Rules of Court appellant requested that the court find the rights and duties evidenced by both the "milk contract" and the "milk pool quota." Appellant did not submit any draft of the findings which it urged the court to adopt. Our decision in *Jay* v. *Dollarhide* (1970) 3 Cal.App.3d 1001 [84 Cal.Rptr. 538], expresses what we believe is the function of findings and the circumstances under which requests for special findings should be made. We said, pages 1032-1033:

". . . The Code of Civil Procedure sections 632 and 634 only require that the findings shall disclose the court's determination of all issues of fact in the case. This has been properly interpreted to relate to ultimate facts and not to require the court to make a specific determination on every conflict of evidence, much less, to diagram all the intermediate decisions on points of law. . . .

". . . . . . . . . . . . . . . . . . .

"The established practice presupposes that counsel desiring such special findings will draft and propose them in the usual form (Code Civ. Proc., § 634). The action of the court in approving or disapproving them will constitute the ruling. Appellants here sought to conduct a general inquisition and neither drafted nor submitted any proposals for such consideration.

"Any deficiencies claimed by appellants in this regard are not grounds for reversal of the judgment. [Citations.]"

The trial court in this case made findings as to all relevant issues. Appellant does not call our attention to the omission of any essential finding on any material issue. As in *Jay* v. *Dollarhide, supra,* appellant did not propose in specific language any finding for the court to approve or to disapprove. Appellant cannot be heard to complain.

■ Both appellant and respondent are dissatisfied with respect to the court's ruling as to the time of commencement of interest upon a

resolution of this case. The trial court found that interest should run from the time judgment was entered, December 19, 1972. Appellant asserts that interest should not be recoverable until the appraisers have determined the value of the milk pool quota. Respondent asserts that interest should run from April 23, 1972, at which time all of the issues with respect to the division of partnership assets were agreed upon, with the exception of the milk pool quota valuations.

It is axiomatic of course that both decisional law and the statutes state that interest is recoverable from "the time of breach where the amount of money due is liquidated, or from the time it becomes liquidated." (1 Witkin, Summary of Cal. Law (8th ed.) p. 555. Civil Code § 3287, subd. (a).) The difficulty arises in determining when the sum due becomes liquidated. To bring some flexibility to the matter the Legislature in 1967 added subdivision (b) to Civil Code section 3287, permitting the court in its discretion to award interest on unliquidated claims, provided that such interest could not begin running prior to the filing of the action.

We do not think that the court abused its discretion in not awarding prejudgment interest. Here the delay in bringing the matter to trial was not excessive. Moreover, there was a bona fide dispute of a complicated nature.

Normally we would be required to conclude that the amount due respondent was capable of ascertainment inasmuch as the agreement of the parties provided for the ascertainment of values by an arbitration proceeding. It is not disputed that the arbitration proceeding set forth in the articles of copartnership is binding. The difficulty, however, is that the arbitrators could not function until the court resolved by the judgment in this case what the "ground rules" were. Once those "ground rules" were established it could reasonably be expected that they would proceed with due diligence. It therefore appears to us that the judgment date fixed by the court as the commencement time for interest to run was a reasonable exercise of its discretion.

The judgment is affirmed.

Gargano, Acting P. J., and Franson, J., concurred.