Filed 11/6/23  Estate of Orozco CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of GUADALUPE A. OROZCO, Deceased. | |
| ENRIQUE OROZCO, as Administrator, etc., | F084979 |
| Petitioner and Appellant, | (Super. Ct. No. PR18000116) |
| v. | |
| SAMUEL R. OROZCO, JR. et al., , | **OPINION** |
| Objectors and Respondents. | |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Stacy P. Speiller, Judge.

Boutin Jones, Michael E. Chase and Michael C. Hopkins, for Petitioner and Appellant.

Kroloff, Belcher, Smart, Perry & Christopherson, Rebecca H. Sem and Kelsea A. Carbajal, for Objectors and Respondents.

-ooOoo-

This probate matter arose after Guadalupe A. Orozco, matriarch of the Orozco family, died at the age of 86 on March 27, 2018.  Guadalupe Orozco's will was admitted to probate on October 24, 2019.  Her son, Enrique Henry Orozco (Henry Orozco), was appointed special administrator and personal representative of her estate on the same day.  Guadalupe Orozco's estate plan encompassed a pour-over will and a family trust (the trust had been established in 1995).  On December 18, 2020, Henry Orozco filed a petition for return of property to the trust pursuant to, inter alia, Probate Code section 850; this petition is the pleading underlying the instant appeal.  The petition sought the transfer to the trust of several properties held by various Orozco family members, who are the respondents in this matter.  After a bench trial, the probate court denied Henry Orozco's petition.  Henry Orozco appealed.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The probate court succinctly summarized, in its statement of decision denying Henry Orozco's Probate Code section 850 petition, the evidence adduced at trial in this matter.  We will include excerpts from the probate court's statement of decision in outlining the factual background relevant to the issues on appeal.  The probate court noted, in its statement of decision:[1]

> "Decedent Guadalupe A. Orozco died on March 27, 2018.  During their lifetimes, Guadalupe[2] and her husband John (who died well before the events at issue in this dispute) had seven (7) children – Samuel Orozco Sr. (Samuel), Enrique Orozco (aka Henry), Paul Orozco (Paul), Daniel Orozco (Daniel), Roy Orozco (Roy), Anthony Orozco (Anthony) and Rebecca Orozco (Rebecca).  John was over two decades older than Guadalupe and had children from an earlier marriage.

---

[1] Footnotes appearing in excerpts from the probate court's statement of decision are from the latter but are numbered differently here.

[2] "Guadalupe also went by the nickname 'Lupe' – the Court will use her more formal name."

2.

"The parties agree that Guadalupe was a strong, intelligent and business-minded woman. According to everyone, Guadalupe was the 'driving force' behind the couple's investments in real estate. The parties agreed that John was not particularly involved with Guadalupe's various real estate deals – thus, the properties Guadalupe accumulated during her lifetime were typically titled in her name, and designated as her separate property.[3]

"Guadalupe and John had a relatively straightforward estate plan – including pour-over wills and a family trust – the 'John and Lupe Orozco Family Trust, dated May 17, 1995' (Trust). Pursuant to the original terms of the Trust, each of the couple's seven children were to receive an 'equal share' of the trust – and each child (with one exception – Roy) was to receive 'gifts prior to distribution' of one 'house' [Roy was to receive two houses].[4]

"The testimony at trial demonstrates that several years before her death on March 27, 2018, Guadalupe began systematically transferring properties to her children (and grandchildren). All of her children (and two grandchildren) appear to have benefitted from her actions – although they did not all benefit equally. In the Court's opinion, it is the perceived inequity of her actions combined with the unconventional and relatively informal way she handled these transactions that has resulted in the lawsuits between/among her children and grandchildren."

The probate court added: "While the Court has no doubt that Guadalupe was an intelligent and strong-willed businesswoman – when it came to property transactions involving her family – she appears to have been less concerned about making sure the usual business formalities were observed. This relative informality created a lot of confusion for some of her children—including the administrator and personal

---

[3] "The Court notes this was the way Guadalupe typically held title to property – however, it was also routine for Guadalupe to transfer her properties to and from the [family] Trust [see below] and to and from her children and grandchildren."

[4] "The Court notes that despite the existence of the Trust as of 1995, Guadalupe continued to hold most of her real estate portfolio as her 'separate property.' The Court also notes that none of the properties listed on Schedule A of the Trust remained in the Trust as of Guadalupe's death."

representative of her estate, Henry."[5]  The probate court described divisions in the family that led Henry to file the instant Probate Code section 850 petition:

> "For their part, Henry, Roy and Rebecca believe these disputed real property transactions were the product of undue influence, elder abuse and fraud perpetrated by (at least) Samuel[6] and Paul when Guadalupe (an elder adult by definition at all pertinent times at issue herein) was particularly vulnerable.  Thus, they seek to return the property involved in these transactions to Guadalupe's estate (and ultimately the Trust) for 'proper' distribution pursuant to their parents' estate plan.

> "In contrast, Samuel, Paul and Daniel believe Guadalupe purposefully and intentionally executed the transactions with the understanding that she was following the general 'terms' of her estate plan.[7]  Samuel, Paul and Daniel vehemently deny attempting to unduly influence Guadalupe – and contend that Henry's attempt to marshal the assets of Guadalupe's estate by questioning these transactions (and trying to 'clawback' the property involved) is misguided because all of the real property in question was to be distributed via gift/outright to the beneficiaries prior to dissolution/distribution of the Trust.

> "Samuel, Paul and Daniel, for their part, believe that Guadalupe was acting of her own free will when she transferred real property in and out of her name and the Trust, while encumbering (or allowing her children and grandchildren to encumber) the various properties with loans etc."

As the probate court noted, "[i]n his [Probate Code] [s]ection 850 petition[,] Henry assert[ed] claims related to six parcels of real property."  When Guadalupe died, title to two of these properties—945 North 7th Street, San Jose and 458 North 7th Street, San Jose—was held by Samuel and his wife Elizabeth as joint tenants (Guadalupe had deeded

---

[5]  The probate court noted:  "Anthony died (after both of his parents had died) on July 11, 2019.  It is undisputed that Anthony's children will succeed to his share of his parents' estate as set forth in their estate planning documents."

[6]  "Henry also alleges that Samuel's sons Samuel Orozco, Jr. (Samuel, Jr.) and Jeremy Orozco (Jeremy) were involved."

[7]  "Or at least that she was freely transferring and encumbering the properties (or allowing them to be encumbered) pursuant to her 'pensamientos' [thoughts, ideas] – as Samuel testified."

4.

these properties to Samuel and Elizabeth in 2014, during her lifetime). Title to one of the properties, 30 West Reed Street, San Jose, was held by Paul Orozco (Guadalupe sold this property to Paul in 2011, during her lifetime). Title to another property, 330 South 3rd Street, San Jose, was held by Iguanas Real Estate Holding (Guadalupe sold the property to Iguanas in 2011, during her lifetime); Samuel's son, Jeremy, is the founder and CEO of Iguanas Real Estate Holding and a related company, Iguanas Burritozilla Corp. Title to the final two properties—425 North 7th Street, San Jose, and 1836 Thyme Court, Gilroy—was held by Samuel, Jr., and his wife Yesenia (Guadalupe transferred 425 North 7th Street to Samuel, Jr., and Yesenia in 2011, and Samuel, Jr., and Yesenia bought 1836 Thyme Court from an unrelated third party in 2019, after Guadalupe's death).[8]

Henry conceded at trial that his mother had both the authority to make the above transfers and the right to set the terms of the transactions in which she transferred the title to various properties to, respectively, Samuel and Elizabeth; Paul; Iguanas Real Estate Holdings; and Samuel, Jr., and Yesenia. Henry further acknowledged he had "no direct evidence" that any of his siblings or nephews coerced Guadalupe to make the above-described transfers. Henry also acknowledged there was no evidence his mother suffered from any cognitive or mental deficits during the period in which the disputed transactions occurred. In addition, Henry was not aware of any medical condition or diagnosis that would have rendered Guadalupe incapable of making financial decisions, during the relevant period. Finally, Henry conceded that, during the period when the disputed transactions occurred, Guadalupe was not under conservatorship, nor had she granted any power of attorney as to her financial affairs.

Samuel also testified at trial. Samuel had participated in several property transactions with his mother since at least 1998, mainly for purposes of securing loans

---

[8] Henry does not argue on appeal that 1836 Thyme Court was obtained by Samuel, Jr., and Yessenia by exerting undue influence upon Guadalupe.

against various properties, and ultimately for taking over the ownership of 945 North 7th Street and 458 North 7th Street, both in San Jose. Samuel and his wife had lived in 458 North 7th Street since 1983 or 1984. Initially, they spent "tens of thousands of dollars" to make the house habitable; later, they spent "[h]undreds and hundreds of thousands of dollars" to update the plumbing and electrical systems and redo the foundation (the house was built in the 1880s). Samuel and Elizabeth had paid the mortgage on 458 North 7th Street since they moved in (they were still paying the mortgage at the time of trial).

Around 2011, Samuel moved into 945 North 7th Street, at which time he began paying the mortgage on 945 North 7th Street, in addition to the mortgage on 458 North 7th Street that he was already paying. Over time, various loans had been taken out against these properties. Some of the loans were likely obtained to support Iguanas Taqueria, a restaurant operated by Samuel's family since 2006, but others were simply refinancings or loans taken out by Guadalupe for various reasons. Upon Guadalupe's death, Samuel paid off her outstanding loans on these properties. With respect to the property transactions made by Guadalupe in her lifetime, Samuel testified: "It was standard practice, and it was in agreement amongst the family to use the properties for the benefit of the children and for [the parents'] benefit also."[9] Samuel also explained that

---

[9] Samuel testified: "I got 945, 458 [in San Jose]. Paul got 30 West Reed [in San Jose]. Henry got 549 Summerton [Lane] [in Turlock]. Becky got one and a half properties 255 Fairview [in Paso Robles] and she also got [758] Oxen [Street] in Paso Robles. Roy got [a duplex on 17th and] Washington Street, then he got [716 East Mission] [in San Jose]. The only one who didn't get property is my deceased brother Tony. That's the only one. Henry sold [Tony's rightful] property in Ceres. So we're in this situation now where we have to figure out how my brother's kids are going to get his inheritance but that is my simple laym[a]n's understanding of a pour-over will and the trust." Samuel added that Daniel got a house on 18th Street (875 N. 18th Street) in San Jose. Samuel further noted that when Guadalupe died, her estate held title to half of one of the Paso Robles properties, as well as a house in Modesto and the one in Ceres [in which Tony had lived]. Samuel observed: "Part of [Henry's] duty as administrator is to follow the pour-over will and take those assets and put them into the trust. That is his

one of the reasons Guadalupe favored "parent/child transfer[s]" was "she knew the tax base wasn't going to change."

Guadalupe came to hold all her properties as her sole and separate property. Samuel explained: "Her motivation was my father didn't want to be part of her real estate business, and he wanted to give her the freedom to do as she wanted to do with her properties. If she wanted to take a loan, she could take a loan. If she wanted to sell it, she could sell it. If she wanted to gift it to her children, she can do it. It was her decision, and my father wanted to make sure that my mom had the power to do what she wanted with her properties." Samuel added, "My father respected her abilities with real estate." Samuel confirmed: "My mom was sharp until the day she died."

Samuel never gave his mother financial advice or helped her oversee her real estate business by, for example, making tax-related decisions or other decisions. He testified: "My mom was a very smart business woman. She knew how to take care of her properties." He also observed: My mom, good businesswoman, she did what she wanted to do. Nobody could tell her what to do." Samuel served as an "intermediary" between his mother and her accountant, but only for purposes of conveying the accountant's requests for documents to his mother and delivering the documents to the accountant. Samuel did not know the substance of the documents; he simply acted as a courier. Samuel also noted that although Guadalupe's first language was Spanish, she negotiated many contracts in English and had the option of having her children translate for her as needed.

Daniel, Paul, Samuel, Jr., and Jeremy also testified at trial. All of them testified that Guadalupe was a strong-minded and astute businesswoman who made her own decisions about what to do with her properties. They indicated no one pressured

role." Samuel criticized Henry for selling off the Modesto and Ceres properties instead of putting them in the trust.

7.

Guadalupe regarding how she should handle her affairs. Henry did not contradict these assertions in his trial testimony. Henry was asked at trial: "[I]sn't it perfectly possible, if not likely, that your mother … freely and of sound mind made these decisions [as to the transfers of the disputed properties] herself?" Henry answered: "I don't know what her mental state was … on these specific … transactions."

As for the matter's procedural history, the trial in this matter encompassed a total of *three* petitions in *two* related cases. One of the cases, *In re the Estate of Guadalupe A. Orozco*, was initiated by Henry and involved his petition pursuant to Probate Code section 850 (discussed above). The other case, *In re the John and Guadalupe Orozco Family Trust*, was initiated by Samuel, Paul, and Samuel's sons (Samuel, Jr., and Jeremy), and involved (1) a petition by Samuel seeking an order construing trust instrument, determining rights and powers, ascertaining beneficiaries, instructing trustee, quieting title and removing trustee, under Probate Code sections 850 and 17200(b), and (2) a petition by Samuel, Paul, Samuel, Jr., and Jeremy to remove Henry as personal representative of Guadalupe's estate on grounds that Henry's actions were misguided and were damaging the estate. The trial court ultimately denied all three petitions. Only Henry appealed and the instant appeal relates solely to the court's denial of Henry's petition.

## DISCUSSION

**I. The Probate Court Properly Declined to Apply a Presumption to the Effect that the Disputed Property Transfers were the Product of Undue Influence, and Properly Found that Henry Did Not Meet his Burden of Proof to Establish Undue Influence**

The primary issue on appeal relates to Henry's allegation that Guadalupe transferred the disputed properties (458 North 7th Street (Samuel), 945 North 7th Street (Samuel), 30 West Reed Street (Paul), 330 South 3rd Street (Jeremy), and 425 North 7th Street (Samuel, Jr.)) under undue influence from the respective grantees. The probate

8.

court concluded *Henry had failed to prove*, under the governing standard of proof, that the respective grantees had exerted undue influence on Guadalupe in this regard. Henry challenges the probate court's ruling. Specifically, Henry argues the court should have shifted the burden of proof to the grantees, thereby requiring *the grantees to prove* the transfers were *not* the product of undue influence. In order words, Henry argues the court should have applied a presumption that the disputed property transfers were the product of undue influence. Henry argues the error requires reversal of the judgment. We reject Henry's contentions and affirm.

### *Background*

The probate court explained, in its statement of decision: " 'Undue influence' means 'excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity.' Probate Code § 8[6], Welfare and Institutions Code[,] § 15610.70(a). There are a number of factors the Court must consider in determining whether undue influence was exercised here: the vulnerability of the victim, the influencer's apparent authority, the actions and tactics used by the influencer, and the equity of the result. Welfare and Institutions Code § 15610.70(a)(1)-(4)." The court further explained, citing *Wallens v. Milliman Fin. Risk Mgmt. LLC* (C.D. Cal. 2020) 509 F.Supp.3d 1204, 1211: "California law recognizes three types of undue influence: (1) the use of a confidential or fiduciary relationship to obtain an unfair advantage; (2) taking unfair advantage of another's weakness of mind; and (3) taking … grossly oppressive and unfair advantage of another's necessities or distress." The court added: "Henry appears to rely mainly upon the first type of undue influence, i.e., the use of a confidential or fiduciary relationship to obtain an unfair advantage."

In analyzing whether the disputed transactions at issue were the product of undue influence, the probate court, appropriately, first considered "the threshold question" of whether a confidential or fiduciary relationship existed between Guadalupe and the

9.

respective recipients, namely Samuel, Paul, Samuel, Jr., and Jeremy. Henry had alleged a confidential or fiduciary relationship existed between Guadalupe and these recipients.[10] The probate court's statement of decision summed up Henry's argument: "With regard to each of the disputed properties, *Henry alleges* that Samuel, Paul, Samuel, Jr. and Jeremy were in a '*confidential relationship*' with Guadalupe and exercised undue influence over her to, essentially, convince her to make these property transactions that were not consistent with Guadalupe's estate plans – including the terms of the Trust." (Italics added.)

The court further observed: "The existence (or absence) of a confidential relationship between Guadalupe and her sons and grandsons is important. If Henry has proved that his siblings and nephews were in a 'confidential relationship' with Guadalupe – the burden of proof with regard to the existence of undue influence shifts from Henry to Samuel, Paul, Samuel, Jr. and Jeremy. In other words, if Henry has proved a confidential relationship existed between Guadalupe and any of these four men, *there is a presumption* that the property transactions Guadalupe executed in favor of them were the result of undue influence. See *Estate of Cover* (1922) 188 Cal. 133, 143; *O'Neil v. Spillane* (1975) 45 Cal.App.3d 147, 153." (Italics added.)

The court went on to describe Henry's arguments regarding the existence of a confidential relationship between Guadalupe and Samuel, Paul, Samuel, Jr., and Jeremy, respectively. The court stated: "Henry cites to *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863[,] claiming that a confidential relationship is '*presumed to exist between a parent and child*.'" (Italics added.) In this context, the court quoted the following passage from Henry's closing brief: "'A confidential relationship exists between

---

**10** After the evidentiary phase of the trial, the probate court ordered the parties to submit simultaneous written closing (and reply) briefs, outlining the trial evidence and the parties' arguments. The closing and reply briefs are not included in the record on appeal.

[Samuel, Paul, Samuel, Jr., and Jeremy] and Guadalupe because of their close, familial relationship combined with the fact that each depended on Guadalupe's advice and guidance, and that Guadalupe reposed her trust and confidence in each.' " The court concluded that "the *mere relationship* of parent and child (or grandparent and grandchild) is insufficient to establish that a confidential relationship existed." In other words, the court declined to find a confidential relationship based *solely on the existence of family ties and the trust and confidence emanating from such ties*.

The court also addressed Henry's other argument in favor of applying a presumption of undue influence in the matter, that is pursuant to the weakness of mind theory of undue influence in the context of inter vivos transfers. The court noted: "As Henry correctly notes 'with respect to inter vivos gifts or conveyances, a susceptibility to imposition, extreme age, and infirmity of the grantor, together with slight evidence of circumstances from which it may be inferred that the instrument was the product of coercion, will suffice to shift the burden of proof and require the beneficiary to show affirmatively that the transaction was fair and free from influence. *O'Neil*, *supra*, 45 Cal.App.3d at [pp.] 147, 155.' " However, the court did not apply a presumption of undue influence pursuant to the weakness of mind theory of undue influence as applied to inter vivos transfers, evidently because of the dearth of evidence to the effect that Guadalupe was impressionable, weak, or infirm.

In sum, the court ruled that Henry bore the burden to prove that the disputed transactions were the product of undue influence. The court further ruled: "Henry has not carried his burden of proof in this regard." The court observed, in this context: "There was little evidence presented that Guadalupe suffered from any weakness of mind or lack of vigor due to age or emotional anguish or a combination of such factors, when the questioned property transactions took place. Nor was there any evidence presented that Samuel, Paul, Daniel, Samuel, Jr., and/or Jeremy took grossly oppressive and unfair

11.

advantage of her. From a purely business-oriented vantage point the decisions Guadalupe made may not be considered the most traditional or conservative. But Guadalupe wasn't dealing at arm's length with third party business partners – she was dealing with family – and she was known to be generous with her family." The court emphasized: "Additionally, if there was one thing all parties at trial agreed upon, it was [that] Guadalupe knew her own mind right up until her death and that if she wanted to do something (or didn't want to do something) there was no convincing her otherwise. She was described as 'a very tough woman' who was 'in no way a pushover.' " (Fn. omitted.)

### Analysis

Henry challenges the court's determination that a confidential relationship did not exist between Guadalupe and the grantees. He argues the court erred in finding a confidential relationship did not exist. We affirm.

Generally, "the existence of a confidential relationship presents a question of fact which, of necessity, may be determined only on a case by case basis." (*O'Neil v. Spillane*, *supra*, 45 Cal.App.3d at p. 153; *Kudokas v. Balkus* (1972) 26 Cal.App.3d 744, 750 ["Existence of a confidential or fiduciary relationship depends on the circumstances of each case and is a question of fact for the fact trier."].) We conclude the probate court properly determined the grantees of the disputed properties did not have confidential or fiduciary relationships with Guadalupe. We further conclude the court correctly declined to apply a presumption of undue influence by shifting the burden of proof to the grantees, namely, Samuel, Paul, Samuel, Jr., and Jeremy. (See *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 550 [grantee must prove fairness of transaction where gift arises in context of confidential relationship]; *Webb v. Saunders* (1947) 79 Cal.App.2d 863, 870 [burden shifts to grantee to show transfer is made freely and voluntarily when grantor and grantee are in a confidential relationship].)

12.

The family relationship between Guadalupe and her sons (Samuel and Paul) and grandsons (Samuel, Jr., and Jeremy) did not itself create a confidential or fiduciary relationship, no matter how close. (*Estate of Jamison* (1953) 41 Cal.2d 1, 10 [kinship alone does not necessarily create a confidential relationship]; *Knapp v. Knapp* (1940) 15 Cal.2d 237, 242 [family connection alone is not sufficient to support a finding of a confidential relationship].) At a minimum, there must be evidence that one family member, with trust and in confidence, gives some degree of control over his or her affairs to the other family member, or is influenced and advised by the other family member in the management of his or her affairs. (See *O'Neil v. Spillane*, *supra*, 45 Cal.App.3d at p. 153 [confidential relationship exists where 80-year-old grantor relies on grantee to conduct affairs]; *Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 272, fn. 6 [a confidential relationship refers to "an unequal relationship between parties in which one surrenders to the other some degree of control because of the trust and confidence which he reposes in the other"]; *Sparks v. Mendoza* (1948) 83 Cal.App.2d 511, 514 [confidential relationship existed between mother and daughter where the daughter "acted as her mother's agent and adviser in various business transactions"]; *Estate of Sanders* (1985) 40 Cal.3d 607, 615 [a confidential relationship exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind].)

Here, the record showed Guadalupe was a tough and experienced businesswoman, who managed her own affairs and was in charge of her own decision-making. She was not in an unequal relationship with Samuel, Paul, Samuel, Jr., or Jeremy, and they did not give her financial advice or interfere in her handling of her real estate business. The probate court noted that lack of native fluency in English was not an impediment for Guadalupe: "While the testimony varied, it seems clear to the Court that, on balance, Guadalupe was comfortable her entire adult life conducting relatively complex real estate

transactions in English with the assistance of her children and grandchildren as interpreters." The court further observed: "Even though Guadalupe relied on her children to assist her, based on the evidence presented at trial, there was no indication that she didn't understand what she was signing – and there is no indication that she was mentally unsound or incompetent in later years. All evidence indicated she was still sharp right up to the end of her life."[11]

In short, the evidence in support of the existence of confidential or fiduciary relationships between Guadalupe and the others (Samuel, Paul, Samuel, Jr., and Jeremy) boiled down to the close and connected familial relationships they enjoyed. On this record, the probate court properly found that a confidential relationship did not exist between Guadalupe and the respective recipients of the disputed properties. (See *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1161 ["[T]he 'essential elements' [of a confidential relationship] [are] as follows: ' "[(1)] the vulnerability of one party to the other which [(2)] results in the empowerment of the stronger party by the weaker,

---

[11] Henry presented, at trial, an expert handwriting analyst, who testified that Guadalupe's signature was forged on two documents related to 425 North 7th Street, San Jose, namely a 2008 lease agreement and a 2011 gift letter. The trial court observed that while the expert's testimony raised a "red flag," "the documents upon which Guadalupe's signature was apparently forged were not dispositive documents – in other words, her signature was not forged on a grant deed or a sales contract." The trial court further noted: "Additionally, by all accounts, there were at least 40 bankers' boxes of documents evidencing the various transactions Guadalupe had entered during her life. Henry testified that Guadalupe 'kept everything' – from receipts for a trip to McDonald's to documents related to real estate transactions related to property worth over a million dollars. While the Court does not ignore the two substantiated forgeries, it does weigh them accordingly with the hundreds (possibly thousands) of documents which Guadalupe did sign (or initial) herself. Again – only two documents out of 40 bankers' boxes worth of documents (and related to *one* transaction in [the] 2000s) were proved to contain forged signatures. There is absolutely no indication that Guadalupe's signature was widely or repeatedly forged. Additionally, Henry's evidence doesn't foreclose the possibility that Guadalupe gave someone permission to sign her name." (Fn. omitted; italics added.)

14.

which [(3)] empowerment has been solicited or accepted by the stronger party and [(4)] prevents the weaker party from effectively protecting itself." ' "].)  In turn, the court appropriately declined to find that Samuel, Paul, Samuel, Jr., and Jeremy bore the burden of proving that the disputed transactions were free from undue influence.  The probate court also properly declined to shift the burden of proof to the grantees pursuant to the "weakness of mind" theory of undue influence as applied to inter vivos transfers.  (See *Wallens v. Milliman Fin. Risk Mgmt.*, *supra*, 509 F.Supp.3d at p. 1211 [to state a claim of undue influence pursuant to weakness of mind theory under California law "requires the claimant to establish two elements:  (1) undue susceptibility, and (2) excessive pressure by the other party"].)

Henry argues the probate court "erred in holding" that he "bore the burden of proving that the transactions at issue resulted from undue influence" and the error was of *legal*, not factual, dimension.  Specifically, he contends the court's analysis as to the issue of the existence of a confidential relationship was "legally-flawed" because the court only considered the familial relationships involved, while "ignor[ing]" evidence that established the existence of a confidential relationship.  However, the evidence Henry points to, mainly the fact that the grantees at issue downloaded the transfer deed forms used to effect the transactions, does not show that Guadalupe had ceded a modicum of control of her affairs to the grantees because of her trust in them.  On the contrary, the grantees testified that they acted on Guadalupe's instructions in preparing the deeds.

Similarly, the cases cited by Henry are distinguishable; as in *Johnson v. Clark* (1936) 7 Cal.2d 529, 534-535 (*Johnson*), in which the court found a confidential relationship existed between the plaintiff and the defendant where the plaintiff, on account of the trust she reposed in the defendant, transferred her business and *entire means of income* to the defendant for simply a promise by the latter to pay a monthly amount she could unilaterally reduce, leaving plaintiff little recourse.  Unlike *Johnson*,

15.

here there is no evidence to the effect that Guadalupe risked her entire means of support in making the transactions at issue. (Cf. *Spaulding v. Jones* (1953) 117 Cal.App.2d 541, 552-553 [a presumption of fraud does not arise simply because an instrument was made between family members without consideration].) In light of the applicable law and facts as discussed above, we reject Henry's contentions that the court erred in determining a confidential relationship did not exist and in declining to shift the burden of proof onto the grantees of the disputed properties.

**II.     Paul's 2014 Quitclaim Deed for the 30 West Reed Street Property in San Jose**

Henry next argues the probate court should have granted his petition "at least to the extent that it sought confirmation that title to the 30 West [Reed] property is vested in the Trust." Henry contends: "[O]n April 6, 2014, Paul executed a quitclaim deed in which he granted 30 West [Reed] to Guadalupe. [Citation.] There was no evidence at trial that the 30 West [Reed] property was ever reconveyed to Paul after 2014. The [statement of decision] does not address this issue squarely, or include any explanation why the property should not be deemed to be the Trust's property." We reject Henry's contentions.

During trial, Paul was asked about a document, specifically a standard fill-in-the-blanks quitclaim deed form. The quitclaim deed was from Paul to Guadalupe in relation to 30 West Reed Street, San Jose. The document was dated April 6, 2014, and was signed by Paul; however, the preprinted part for a notary public to fill out was not completed (that is, the document was not notarized). When asked about this document, Paul described a time in 2014 when he "was in the midst of the fight for [his] life" as the plaintiff in a massive lawsuit "against a $30 billion company." Paul stated that, during this time, his mother was very concerned about him. At one point, when he was in the middle of a strategy meeting with his attorneys, his mother called him and told him to meet her at 30 West Reed Street. Paul took a break and went to meet his mother. Paul

16.

testified: "I showed up, and my mother said she was very worried, and she wanted to protect the house. Just like she asked Tony to quitclaim his property so she could hold [it] for him, she wanted to do the same for me. I told her it wasn't necessary because I already had a smoking gun, and I knew I was going to win, and we were talking for maybe 45 minutes." Paul said either he or his mother had a blank quitclaim deed: "I don't know if my mom already had the document, I believe that's what happened[,] or I might have had one in my home. But nevertheless, on the hood of my car, my mother said, well, we need to protect your home just in case you lose."

Paul said he signed the quitclaim form to appease his mom, but he told her it was not valid as it was not notarized and "it wouldn't be sufficient to protect any property." Paul explained he did not intend to "give up the rights" to his property; rather, "the quitclaim was done really haphazardly to appease [his] mom so she could sleep." Paul emphasized the quitclaim document "was never intended to transfer property," it was "not perfected," it was never notarized, his mother never "brought it up again" and did not record it, and he "totally forgot about it" because "it was of no consequence." In Paul's mind, the quitclaim document was not "notarized or finished," "was never intended to be recorded," and "never could be recorded."

"A deed takes effect only when delivered." (Witkin, Summary of Cal. Law (11th Ed. 2017) Real Property, §§ 265, 303 (Witkin); Civ. Code, § 1054 ["A grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor."].) "Delivery depends on the intention that title will pass irrevocably." (Witkin, *supra*, § 303.) "It is a question of fact, and evidence of the circumstances [citation] and of the acts and declarations of the grantor [citation] may be offered on the issue." (*Ibid*.) "The grantor may testify as to the grantor's own intent, and the court may find from the testimony that no delivery took place." (*Ibid*.)

Here, Paul testified he did not consider the quitclaim deed to be valid as it was not notarized and told his mother as much. He explained he viewed the deed as defective and believed it could not be recorded. He further testified he did not intend to irrevocably transfer his property to his mother via the "haphazardly" drafted document. Paul's testimony is sufficient to establish delivery did not take place and, in turn, that title to 30 West Reed Street was never transferred back to Guadalupe.

*Kimbro v. Kimbro* (1926) 199 Cal. 344 is instructive in the present context. In that case, the grantor's wife requested he sign a deed. He did, saying, "Well, I will sign the deed, but it won't benefit you any for it is not acknowledged." (*Id*. at p. 350.) The *Kimbro* court held there was no delivery. Acknowledgment is not essential to delivery, but the grantor, believing it necessary, did not consider the deed valid, and hence lacked the intent to make an absolute transfer. (*Id*. at p. 348.) Under *Kimbro*, the fact that Paul believed the unnotarized quitclaim deed was invalid, indicates he lacked the intent to make an absolute transfer by signing it and handing it to his mother.

The probate court denied Henry's petition insofar as it sought return of specific properties to the trust, including 30 West Reed Street. While Henry now complains the statement of decision did not specifically address the quitclaim deed issue, he did not request the court to clarify its statement of decision on this point. "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.... If the appellant fails to [bring ambiguities and omissions in the factual findings of the statement of decision to the trial court's attention], the reviewing court will infer the trial court made every implied factual finding necessary to uphold its decision, even on issues not addressed in the statement of decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48; see *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-

18.

1134.)  We conclude the probate court impliedly found there was no delivery as to the disputed quitclaim deed.

We further note the probate court was only required to make findings on "ultimate facts."  (*Moreno v. Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 447.)  It did not have to " 'make a specific determination on every conflict of evidence, much less, to diagram all the intermediate decisions on points of law.' "  (*Ibid*.)

### III.    Paul's $150,000 Loan From Guadalupe and Related Promissory Note

Henry's final argument on appeal relates to a loan in the amount of $150,000 that Paul took from Guadalupe.  Specifically, Henry argues:  "During the trial, Paul admitted that Guadalupe had loaned him $150,000.  [Citation.]  Pursuant to the loan, Paul executed a promissory note.  [¶] … [¶]  [T]he trial court should have granted the Petition as to the $150,000 loaned to Paul.  The Judgment denying the Petition should be reversed for this … reason."  We disagree with Henry's contentions.

At trial, Paul testified Guadalupe had loaned him $150,000, in return for which he had executed an unsecured promissory note dated August 6, 2011.  The loan was to support a new business that Paul had opened.  Paul testified:  "[M]y mother was in no way a pushover.  She always wanted to know what you were doing and if there was a business opportunity, she wanted to know about it, and she wanted to know whether she could help, and it wasn't just me.  It wasn't just Sam or his kids.  The same went for Becky, her children, Tony."  Paul added:  "So my mother never [wavered], not mentally [or] physically in her willingness to support and sacrifice for the better good of her children and our family, never."

Paul stated he had not made payments on the loan, nor was the loan amount owed to Guadalupe's estate.  Paul explained his mother never asked him to repay the note or sent him a notice of default.  On the contrary, Paul identified an exhibit consisting of eight checks totaling approximately $50,000, made over the period from August 2012 to

19.

March 2013, that he gave to his mother, but his mother never cashed the checks. Paul did not ask her not to cash the checks; in fact, Guadalupe was "very aware that [his] sales and business [were] doing well" at the time. These checks were for other smaller, loans that Guadalupe had made to Paul. Paul was making all the payments on his mortgages and Guadalupe "knew that there was cash to be had." Paul testified: "She chose not to take it because … she wanted to support me through my lawsuit." Paul added: "It wouldn't be the first time that my mother refused payment from [one of her children]." He continued: "I cannot control what my mother does period, and I will tell you, if she wanted her money, she was relentless and would say, I want the 1,500 you said you would have on Monday or whatever it was. I need my money for my payment. I need it for my taxes. I need it for mortgages."

The trial in this matter also encompassed a separate petition filed by Samuel, Paul, Samuel, Jr., and Jeremy seeking to remove Henry as administrator of the estate. Samuel, Paul, Samuel, Jr., and Jeremy alleged that " 'Henry is using his position as administrator of the Estate to bring...improper claims against [us] in an effort to further his personal interests,' " and sought Henry's removal "to prevent him from using his position to further advance his personal objectives." The probate court addressed the issue of Paul's promissory note for $150,000, in the context of both Henry's petition and the petition brought by Samuel, Paul, Samuel, Jr., and Jeremy that alleged Henry was persecuting them with unwarranted litigation.

The court stated, in its statement of decision: "Henry had a duty to investigate this promissory note, as it was clear the funds had not been repaid to Guadalupe. Testimony too at trial was mixed and somewhat evasive – Paul confirmed he did not repay the loan but indicated he was also not responsible at this time for the repayment. From this Court's vantage point, Guadalupe could have collected the money before her death but chose not to do so. Perhaps the funds were gifted to Paul or perhaps the loan was

20.

forgiven. No answer at trial was provided, and there appears to be a bigger statute of limitations issue. Unfortunately, as with so much in this case, Henry as administrator had no choice but to pursue the claim given the existence of the note and the stonewalling of any meaningful response."

The court's discussion of this issue in its statement of decision shows the court assessed the evidence bearing on the status of the $150,000 loan and found that Henry, who bore the burden of proof as to the claims in his petition, had failed to prove that Paul was required to repay the $150,000 loan to Guadalupe's estate. At the same time, the court concluded Henry was nonetheless justified in pursuing the repayment claim, and took that into account in denying of the petition for removal of trustee filed by Samuel and the others. We detect no error in the trial court's determinations.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.[12]

SMITH, J.

WE CONCUR:

HILL, P. J.

FRANSON, J.

---

[12] The brief filed by respondents' counsel contains numerous factual assertions that are not supported by citations to the record. Counsel is admonished to comply with California Rules of Court, rule 8.204(C), in all future briefs filed with this court.

21.